In RE QUÆRE OF THE PROCEDURE OF THE TWO
HOUSES OF THE LEGISLATURE IN CONTESTS OF
THE ELECTION OF EXECUTIVE OFFICERS.

[FILED JANUARY 27, 1891.]

1. **Legislature**: CONTEST PROCEEDINGS: JOINT RESOLUTION:
SIGNATURE OF EXECUTIVE. The last clause of section 4, and
section 15 of article 5 of the constitution, and the last clause of
section 77 of chapter 26 of Compiled Statutes construed, and
*held*, that the passage and adoption by the legislature, in the
manner provided by law, of a concurrent resolution fixing a day
for the uniting of both houses to determine by joint vote con-
tested elections for officers of the executive departments, its
signing by the presiding officer of each house, its presentation to
and approval by the governor, or in case of his return of the same
with objections within five days, Sundays excepted, its recon-
sideration and approval by three-fifths of the members elected
to each house, are indispensable proceedings to the legality of a
joint meeting of the two houses to determine contested elections.

2. ———: ———. *Held*, Applicable to the procedure contesting the
election of persons declared elected to the offices of governor

and lieutenant governor, who have qualified and entered upon their duties, and applicable to all other executive officers.

3. "A casus omissus in a statute cannot be supplied by a court of law, for that would be to make laws." (Butler, J., in *Jones v. Smart*, 1 T. R., 51.)

QUÆRE submitted by legislature as to constitutionality of contest proceedings under a joint resolution not signed by governor and lieutenant governor.

*Lamb, Ricketts & Wilson; Allen, Robinson & Reed*, and *V. O. Strickler*, for constitutionality of such proceedings.

*J. C. Cowin*, and *Charles L. Hall, contra.*

The following resolutions were presented to the court by a committee of the joint session of the two houses of the legislature, requesting the opinion of the court thereon :

"WHEREAS, There are certain members of this joint convention in doubt as to the constitutionality of our procedure, without the signature of the *de facto* governor and lieutenant governor of the state to the joint resolution by which we are convened, and

"WHEREAS, There is a general desire among such members to have the construction of the honorable supreme court upon the matter, therefore, be it

"*Resolved*, That the speaker of the house appoint a committee of three to wait upon the honorable judges of the supreme court and ask for an immediate opinion upon the following questions, to-wit:

"*To the honorable the supreme court of the state of Nebraska:*

"*Be it Resolved*, By the senate and house of representatives of the state of Nebraska, sitting at a joint convention under section 4, article V of the constitution of said state, to try certain contests for the executive offices named in section 1, article V of the constitution, as follows:

"WHEREAS, A question has arisen as to the constitutional right of this joint convention to proceed with the trial of certain contests for the several executive offices named in section 1, article V of the constitution of Nebraska, without the joint or concurrent resolution therefor being first signed by the governor of the state, therefore be it

"*Resolved,* That the opinion of the supreme court of the state of Nebraska be and the same is hereby asked upon the following questions:

"First—Where a contest is pending before this joint convention, convened in the manner and for the purpose aforesaid, for the office of governor of the state of Nebraska, and the contestee therefor is the acting or *de facto* governor of the state, is it necessary to the constitutionality or validity of the resolution therefor named in section 77, chapter 28 of the Compiled Statutes, that such resolution shall first be signed or approved under section 15, article V, of the constitution of this state by said acting or *de facto* governor?

"Second—If such resolution should be presented to the acting or *de facto* governor of this state, he at the time being a contestee for the office of governor, which is to be determined by this joint convention acting under said resolution| and under the constitution and the statutes, and he should withhold such resolution or veto the same, would this joint convention, notwithstanding that fact, by a majority vote, have the legal power to proceed and determine said contest under such resolution?

"Third—Where the office of lieutenant governor is also being contested before this joint convention, as provided by the constitution and the statutes of the state, would it be necessary to the legality of the proceeding of this joint convention that the resolution for a joint convention to try the contested election for said office at the same time that the contest for the office of governor is to be tried, should be

In re Contest Proceedings.

presented to the acting or *de facto* lieutenant governor for his signature, and, if the acting or *de facto* lieutenant governor should withhold his signature from said resolution or veto the same, would this joint convention, notwithstanding that fact, have a right to proceed to try said contests?

"Fourth—Where all of the executive officers named in section 1, article V of the constitution, are being contested, and the senate and house of representatives have duly passed a concurrent or joint resolution fixing the time and place for the trial of said contests, as provided by the constitution and the statutes, is it necessary to the validity of such resolution or the proceedings in such contests that such resolution be presented to either the acting or *de facto* governor, or *de facto* lieutenant governor, each of whose offices are being contested, and are mentioned and are embraced in said resolution? We respectfully ask an early answer to these questions.

" WHEREAS, This joint convention is meeting by virtue of separate motions fixing the time thereof, passed by the senate and house of representatives, as well as by virtue of a concurrent resolution; and

" WHEREAS, Other questions may arise thereunder in the minds of many members which may require the opinion of the honorable supreme court; therefore, be it

" *Resolved,* By this joint convention that copies of said motions and this resolution be transmitted to said court, and, under said motions the court be requested to answer the following question, to-wit:

" Has this joint convention the right to sit and determine the various contests for executive state offices under said motions, regardless of any provisions of a joint or concurrent resolution?

"Attest:                              C. H. PIRTLE,
                              "*Secretary of the Senate.*

" WHEREAS, The house of representatives has been officially notified that a contest for each of the several executive

offices of the state of Nebraska for the term commencing on the first Thursday after the first Tuesday of January, 1891, is now pending, wherein John H. Powers is contestant and James E. Boyd is contestee for the office of governor of the state of Nebraska; W. H. Dech is contestant and T. J. Majors is contestee for the office of lieutenant governor of the state of Nebraska; C. N. Mayberry is contestant and John C. Allen is contestee for the office of secretary of state of the state of Nebraska; John Batie is contestant and T. H. Benton is contestee for the office of auditor of public accounts of the state of Nebraska; J. V. Wolfe is contestant and J. E. Hill is contestee for the office of treasurer of the state of Nebraska; J. W. Edgerton is contestant and George H. Hastings is contestee for the office of attorney general of the state of Nebraska; W. F. Wright is contestant and A. R. Humphrey is contestee for the office of commissioner of public lands and buildings of the state of Nebraska; and A. d'Allemand is contestant and A. K. Goudy is contestee for the office of superintendent of public instruction of the state of Nebraska; and that a large amount of testimony has been taken in said several contests which is awaiting the consideration of the senate and house of representatives in joint convention; therefore, be it

"*Resolved*, That Tuesday, the 20th day of January, 1891, at the hour of 10 o'clock A. M. is hereby fixed for a meeting of the senate and house of representatives in joint convention to hear and determine said several contests, with power to do everything in the premises necessary to the full and final determination thereof, and that the senate be asked to concur in this resolution.

"S. M. ELDER, *Speaker*.

"Attest: ERIC JOHNSON,

"*Chief Clerk.*

"In senate, January 19, 1891, read the third time on separate days and passed.     C. H. PIRTLE, *Secretary*."

The following opinion, delivered extemporaneously from the bench by the chief justice, was reported, and, upon revision, became the opinion of the court:

COBB, CH. J.

. Upon the adjournment of this court last night, I was of the impression, and I believe so intimated, that we would immediately commence and write out an opinion in the regular way upon the propositions submitted. I did not expect then to deliver our decision in the manner in which it is now proposed to do it; but there are reasons deemed imperative why we should announce extemporaneously the decision we have come to now, and perhaps take a longer time in the preparation of the final opinion than we feel at liberty to withhold our decision from the parties interested, especially the members of the legislature.

I may say that we find it a larger question than we, or perhaps the public supposed it to be. While this matter has been agitating the public of the state and attracting a great deal of attention for a month or six weeks, since shortly after the election, busy people have not had the opportunity of giving it any of that technical and special examination which law questions of importance demand, and especially one of this magnitude.

It will be conceded, I think universally, that the right of contest of an election otherwise than by legal proceedings in the proper court, is a creature of the constitution and statutory laws. It has been considered necessary to provide for contests by written law at least since the early settlement of Nebraska. While yet in a territorial form of government, and before the passing into statehood was anticipated as a matter of the near future, the legislature of the territory provided for this contingency, and pursuant thereto, the statute, a part of which is to be found on page 144 of the old revised statutes of the territory, was enacted.

Section 29 provides : " Whenever any elector of this territory chooses to contest the validity of an election, or the right of any person proclaimed duly elected to the office of territorial auditor, territorial treasurer, or territorial librarian, he should proceed in like manner" [the previous sections having provided for contests] "in giving notice and taking testimony as is provided in case of contest relative to members of legislative assembly, and said testimony, when taken, shall be certified by the persons before whom the same is taken, with a copy of the notice, to the secretary of the territory, who, with the governor and United States attorney of the territory, shall open and examine the same, and their decision upon the matter shall be final."

That was the law when we passed from the territorial to the state form of government. Under the first constitution and on February 27, 1873, the legislature enacted a statute upon the subject of elections ; section 25 of this act provides the method of contesting the election of executive officers. That section provides: " Whenever any elector of this state chooses to contest the validity of an election, or the right of any person proclaimed duly elected to the office of governor, secretary of state, state auditor, state treasurer, or other state officer, he shall proceed in like manner in giving notice and taking testimony as is provided in case of a contest relative to members of the legislative assembly, and said testimony, when taken, shall be certified by the person or persons before whom the same is taken, with a copy of the notice, to the president of the senate, who, in open session of the senate, shall open the same, and, after due deliberation of the same by the senate, they shall decide which has a right to the office, and their decision shall be final."

This statute remained the law at the time of the adoption of the new constitution, that under which we are now living. In 1877, the first legislature, after the adoption of

the new constitution, passed an act entitled "An act to provide for the canvass of election returns in certain cases, and to repeal sections 19 and 25 of the act of 1873." Section 3 of this act provided: "Whenever any elector of this state chooses to contest the validity of an election, or the right of any person to be proclaimed duly elected to any of the executive offices of the state, he shall proceed in like manner in giving notice and taking testimony as in cases of a contest relative to members of the legislature, provided for in section 22 of an act to provide a general election law, passed and took effect February 27, 1873, and said testimony, when taken, shall be certified by the person or persons before whom the same is taken, with a copy of the notice to the speaker of the house of representatives, in the care of the secretary of state; and the said speaker shall open and publish the testimony at the same time and in like manner as he is in this act directed to open and publish the returns of said executive officers; the members of the legislature shall then by joint vote determine who of the persons voted for is elected to the office thus contested, and such decision shall be final."

This act remained the law until the passage of the act of 1879, entitled "An act to provide a general election law, the procedure relative to contested elections, and the filling of vacancies in office," which was approved March 1, 1879. This is the act under which the proceedings arise which have given occasion for this inquiry and this examination by the court. The most of these provisions are very familiar to the gentlemen whom I am now addressing in particular, and it will not be absolutely necessary to particularize them.

But special attention is called to section 4 of article 5 of the constitution of the state, under which that act was passed, and by the light of which it must be considered. Section 4 of article 5 reads: "The returns of every election for the officers of the executive department shall be sealed

up and transmitted by the returning officers to the secretary of state, directed to the speaker of the house of representatives, who shall, immediately after the organization of the house, and before proceeding to other business, open and publish the same in the presence of a majority of each house of the legislature, who shall for that purpose assemble in the hall of the house of representatives. The person having the highest number of votes for either of said offices shall be declared duly elected, but if two or more have an equal and the highest number of votes, the legislature shall, by joint vote, choose one of such persons for said office. Contested elections for all of said offices shall be determined by both houses of the legislature, by joint vote, in such manner as may be prescribed by law."

In pursuance of that clause of the constitution, the act of the legislature which we are about to consider was passed. It seems to have been the second, and it must be presumed, the better judgment of the people as represented in the legislature of the state; and I may say here that this election law is one of the acts—one of the chapters of the statute by which we are now governed—that was arranged by the commission that was appointed for the purpose of codifying the laws by virtue of the act of the legislature of 1877. Two of these commissioners, to-wit, Mr. Calhoun and General Conner, were members of the convention which drafted the constitution, which, upon being submitted, was ratified by the people of the state; the other member, as most of you know, was Mr. Ames of this city, all of them lawyers of well known ability.

So far as I know, or am able to ascertain, the work of that commission, especially that which we are now considering, was original. I do not find that it was "borrowed," as the term is used, from any other state; possibly it was, but my advice is that it was original with the compilers. Of course, we must believe that, upon its being reported to the governor and by him to the legislature, as the work

of that commission, it was duly considered and weighed by the representatives of the people, and thus became in a double sense the nature and deliberate enactment of the people as represented in the general assembly, the legislature of the state.

Before we examine this statute, however, I will state that in making up our opinion special weight and consideration must be given to the constitutional provision requiring that this function of contest should be decided by the two houses of the legislature in the manner provided by law; and while I concede that that proposition is liable to branch out into a great many considerations, and leads to an almost exhaustless field of investigation, or may, yet, it is perhaps not necessary that we should follow it into all to which it may invite us.

In the course of the argument yesterday, it was suggested by one of the attorneys that the procedure of the legislature was generally—and the argument was that it might be in all cases—regulated by the joint rules of the two houses, or by the rule of that house whose procedure might be under consideration. Now, in one sense that suggestion is undoubtedly true. It is, or was once, the universal rule that the laws which are to govern the procedure of the legislative bodies and were not the general standing laws governing all the people, were to be enacted, so to speak, in the shape of rules which they should formulate and prescribe for themselves. Under that idea it was that the legislature in all the older states, and some of the newer ones, were almost unlimited in their field of legislation. But about forty years ago the idea began to prevail that the practice of legislative bodies should be controlled by law in many of the most important things which they were called upon to do. Before that time all chartered privileges were given out by the legislature with scarcely any restriction upon its actions, and at this time, in the state of Ohio, where, I believe, this reform started,

it was believed that there was too much favoritism.   Gentlemen wrote out charters for incorporations and brought them up there, appointing themselves as directors and officers of the corporations, and by manipulation before the legislature were speedily invested with corporate powers. And it also transpired that gentlemen met at the capitol from various sections of the state, one having a favorite measure for the north, another for the east, another for the west, and another for the south, neither one of which standing alone could command a majority of the legislature, but by a combination of those interests they could put them all through in a body.   Hence it was that it was deemed expedient in the amended constitution of that state, to be followed by other states which have adopted constitutions since then, that the power of the legislature to grant charters for special incorporations was reserved, and a provision adopted by virtue of which general incorporation laws were passed placing all men on an equal footing and starting everybody out in the race for special privileges. Whether wisely or not it is not for me to say, although I confess I have a firm opinion on that subject.

But it was in a line with that thought, with that sentiment, which became almost universal in this country, that all of those constitutional provisions which provide that the title to bills which before that time had been considered a mere matter of form, and up to 100 years ago were not attached to bills when they passed the legislative bodies, but were attached to them by the clerks as a kind of label, I say it was in obedience to this sentiment that it was provided in later constitutions that no act should contain more than one subject, and that should be clearly expressed in ·its title; and the constitutions in many other respects provided especially the manner in which the legislative functions should be exercised and performed by the legislature; and in this, took away largely from these bodies the power to regulate their form of procedure, merely by their own

rules, which need not go through any of the forms of legislation. It was in obedience to this change of sentiment that our constitution finally provided that all bills and joint resolutions should be read on three separate days in each house respectively, and also provided that all bills should pass by a majority—not of a quorum—which had once been the universal rule, but by a majority of all the members elected to each house, and that the votes should be taken by ayes and noes, and entered upon the journal.

With these remarks, I come to the section which was enacted in the manner proposed by the commission—enacted by the legislature and formally adopted as the law twelve years ago—section 77. Bear in mind that this act was passed in strict conformity to the constitutional provision which I have read: "Contested elections for all of said offices shall be determined by both houses of the legislature by joint vote in such manner as may be prescribed by law." "Upon the reception by such presiding officer of papers relating to contested elections, they shall immediately give notice to their respective houses that such papers are in their possession. Where the papers relate to the contest of any executive state officer, the house of representatives shall notify the senate, and a day shall be fixed by both houses by concurrent resolution, for the uniting of the two houses to decide upon the same, in which decision the yeas and nays shall be taken and entered upon the journal."

Now that section is the law of the land. Its constitutionality has not been attacked in this court, and until it is, it has all the binding force of a constitutional provision. If it is attacked, while it is impossible for the court to tell what line of thought may be presented, or what authorities might be shown applicable to the subject, it is almost impossible to conceive without such suggestion or argument, that it could be held to be otherwise than in strict conformity to the requirements of the constitution which

18

I have read.    To make an application of what I have said
and read to the question which is before us, it is necessary
to refer to section 11 of article 3 of the constitution, which
reads : " Every bill and concurrent resolution shall be read
at large on three different days in each house, and the bill
and all amendments thereto shall be printed before the vote
is taken upon its final passage.    No bill shall contain," etc.
" The presiding officer of each house shall sign, in the
presence of the house over which he presides, while the
same is in session and capable of transacting business, all
bills and concurremt resolutions passed by the legisla-
ture."

Now, unless we are astray fundamentally in our view
of this constitution and law, it was essential to the validity
of a concurrent resolution for any purpose whatever, that
it should have been signed by the presiding officer of the
senate, as well as of the house.

It is suggested, and is a matter of history, that the pre-
siding officer of the senate is one of the men whose elec-
tion is contested.    It is barely possible that the learned
men who drafted this statute, and the learned legislative
representatives of the people who enacted it into a law,
failed to take into consideration the possibility—perhaps I
might say the probability—that some time or other in the fu-
ture history of the state the lieutenant governor's right to the
office would be attacked by contest proceedings.    Granted
that they did fail to take that into consideration at all, then
where are we left?    What is the position?    If it was clear
that they did not take that into consideration in the
passage of the law, then in the wide field of construction
that is left to the courts, especially those of last resort, the
wide field of discretion to construe the laws so as to carry
out the true intent and meaning of the law-makers, would
we be given the power to so construe their language as to
carry out what we believe to have been their true intent
and meaning?

I need scarcely say to the able lawyers that I am now addressing that no such power exists in the courts in cases of *casus omissus*.  If it is true that this contingency absolutely escaped the attention of the law maker, then it is a case unprovided for, it is a *casus omissus* which cannot be supplied by judicial construction.  I believe that is the doctrine of the law books.  So that even looking at this case in the light that if we construed the law in a certain way, there would be a failure of the administration of the law, and hence considering every doubtful provision so as to make the law consistent with itself in all its parts, if that were necessary in this case, it would be impossible for any court to supply a *casus omissus* by giving force and effect to the language of the statutes when applied to a subject about which nothing whatever is said, and which, to all appearances, was not in the minds of the legislature at the time of the enactment of the law. (See sections 19 and 20, Endlich on the Interpretation of Statutes; Potter's Dwarris, pp. 199 to 208.)

But I do not think that we are driven to that consideration.  The mere function of signing a bill, the mere certificate on the part of the presiding officer of the senate that such a bill has passed the house over which he presides by a vote taken by ayes and noes, which is all this signature amounts to in this case, is not, in our opinion, such an act that the presiding officer would be excused from performing by the fact that his personal interests are involved in the matter.

I will grant that there is some distinction between the case at bar—the case of the lieutenant governor and the resolution now under consideration—and that of a presiding official called upon to certify to a financial measure, or a corporation measure in which indirectly he has an interest; I will agree there is some distinction to be taken there, but in general it amounts to about the same as though the gentleman chosen to preside over the senate, who is

generally a man of property, and all sorts of interests, is being called upon to certify to the passage of a bill changing the rate of interest, increasing or diminishing corporate power, or almost any other of the material interests in which an individual may have an indirect and important interest. It is the officer who discharges his duties; he discharges them by virtue of the trust reposed in him by the people as an officer.

It is true that his right to act in that official position is attacked, but it is a well known principle of law, recognized by the bar and the people that even a *de facto* officer's acts, when performed, have all the legal weight and authority of those of the regularly elected and installed officer. So that it is our opinion that there is nothing in the constitution or the laws, or in the feature of the case itself, which made it necessary for the lieutenant governor to step down from his office and fail to act upon this resolution. Not that I insinuate that he did do that at all; I am uninformed officially as to that matter, but if such had been the case, if it was his duty so to do, if it was his duty to refrain from acting in the office to which he has been declared elected, and the duties of which he has entered upon and discharged, in this instance even then there was an alternative officer provided by the statute, to-wit, the president *pro tem.* of the senate, who, as I am at present advised at least, could, in the absence of the lieutenant governor, have performed his functions in all respects.

Therefore we are of the opinion that the resolution itself cannot be taken as evidence of any fact without the signature of some one at least purporting to be the presiding officer of the senate.

And it is worthy of consideration that it is due to the people of this state; it is due to the dignity of the proceeding which is now going on and which has attracted great attention, that a record should be made of these important proceedings. A record should be made which will be looked

back to as an authority perhaps. Whatever the result of these proceedings may be, it will be looked back upon as an authority while this state shall stand as one of the independent states of this republic. I need hardly more than suggest that a record should be made which may be looked back upon with some degree of pride and satisfaction by those who are to come after us. This certainly cannot be done unless the forms of law are, to an appreciable extent at least, complied with. I have looked upon this branch of the case as of perhaps more difficulty, if not of more importance than that which is to be considered hereafter, to-wit: the necessity of presenting this joint resolution to the governor for his signature, for the reason that the signature of the presiding officer of the senate to the joint resolution is something which cannot be substituted by any vote, even a unanimous one of the two houses of the legislature. So that the resolution is either good or bad without the signature of the presiding officer of the senate, and finally and absolutely so. We have come to the opinion that it is bad without the signature, at least until it obtains the signature of the executive. (*Cottrell v. State*, 9 Neb., 125.)

Section 15 of article 5 provides: "Every bill passed by the legislature, before it becomes a law, and every order, resolution, or vote to which the concurrence of both houses may be necessary (except on questions of adjournment) shall be presented to the governor. If he approve he shall sign it, and thereupon it shall become a law; but if he do not approve, he shall return it with his objections to the house in which it shall have originated, which house shall enter the objections at large upon its journal and proceed to reconsider the bill. If then three-fifths of the members elected agree to pass the same, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by three-fifths of the members elected to that house, it shall become a law, notwithstanding the objections of the governor," etc.

Now, I will be pardoned for saying that upon the scant consideration which I had an opportunity of giving this subject up to the time this resolution of inquiry was presented here, I was inclined to think, and I believe I may say the same of my associates from what transpired in consultation between us upon that matter, that they were of the opinion that upon investigation, which we were sensible we had not given the subject sufficiently, but that upon full investigation it would appear that this kind of a joint resolution, such a paper as that which we are now considering, need not necessarily be presented to the governor at all in any case, and more especially that it need not be in a case where the direct object of the resolution was to question the legality of the election of the individual filling the executive chair. But I will say that upon such investigation as we have been able to give this question since this matter was brought before us, we have come to the conclusion that there is but one answer to this proposition, that is applicable to this resolution for the purpose intended, notwithstanding the peculiar position in which the occupant of the executive chair is placed: That it is necessary that the joint resolution should be presented to him; that it should take the course of all other matters of legislation which the constitution requires shall have either the executive approval, or the additional vote which the constitution requires. And it is to this thought more particularly that our minds have run: whether we are at liberty to put a construction other than those pointed out by the commentators upon the whole statute, and allow the object sought to be accomplished to override the words of the law. I will not say what the result would be, but it is barely possible that if the executive had a final veto, it would be almost incumbent upon the court construing this law to do violence to the rules of construction in order to reach a conclusion other than that to which we have come. But fortunately the governor has not a final veto.

In re Contest Proceedings.

It is probable, it is almost obviously the primary meaning of the provision that "contested elections for all of said offices shall be determined by both houses of the legislature by joint vote," that that joint vote means a constitutional majority vote.    And such is the language applicable to the passage of every bill through the two houses, and it is supplemented only by this other provision which may and does arise in extraordinary cases, that it may meet the objection of the executive upon being presented to him,. and hence be thrown back upon an additional vote and required to pass by a three-fifths majority.

I think that that consideration takes away from the court called upon to construe the whole law applicable to this question, the argument that they must construe the law so that in any event it will not fail of the purpose for which the provisions taken together were enacted.

Section 15 is copied almost literally from the similar clause in the constitution of the United States, with this exception : That in that constitution it is divided into two parts, the first applying only to bills and matters of primal, so to speak, legislation, while the second clause makes it also applicable to, using the exact language of this clause, "order, resolution or vote."    By some means I had got the impression that there was a distinction in the constitution of the United States and the practice of congress between joint resolutions and concurrent resolutions, and upon that idea—and I think some time in conversation I have expressed it—I have been of the opinion that following out that supposed distinction might lead to the method of construing the law of the question which is now before us to the reverse of the opinion at which we have arrived.

But upon a careful consideration of the authorities, and the clauses of the constitution which are applicable, I am unable to see that there is any distinction whatever between a joint resolution and a concurrent resolution, in reference to the necessity of its being presented to the governor.

While, as I have already stated, this state and its prede-
cessor, the late territory of Nebraska, from an early day in
the history of the latter, have had upon the statute laws, ·
and in the case of the former, constitutional provisions, pro-
viding a tribunal and a special mode of procedure for try-
ing contests of the election of executive state officers.
Some of our sister states have corresponding constitutional
provisions and statutory enactments. But many of them
have not, and there was a day not far distant in the past
when none of them had. At that time the law courts of
the several states were the only tribunals, and the writs and
proceedure of the common law the only method of trying
such contests.

The appropriate action for such purpose was informa-
tion in the nature of *quo warranto*. It is of the nature of
this proceeding that it can only be commenced, and the in-
formation therefor filed, by leave of the court. The writ
of *quo warranto* was never anywhere a writ of right, but
courts would not arbitrarily refuse to file the information,
but would exercise a sound discretion according to law.
(See *People, ex rel., v. Waite,* 70 Ill., 25, and authorities
there cited; *People v. Tisdale,* 1 Douglas [Mich.], 59;
*State v. Brown,* 5 R. I., 1; *State v. Lehre,* 7 Rich. [S. C.
L.], 234; *Commonwealth v. Jones,* 12 Pa. St., 365.)

Keeping in mind that from the beginning up to a com-
paratively recent period in the history of the states of the
Union, the only method of trying the title to an office was
by suit in court, and that neither a citizen as such nor a
claimant to the respective offices could commence such
suit as a matter of right, the argument suggests itself with
considerable force in considering the act of the legislature
involved in this case, that while the constitutional provis-
ion which said act was designed to supplement and carry
out, and the act itself, considered together, do give to any
elector the absolute right to contest the validity of the
election of any executive state officer, it may and proba-

bly was in the mind of the law-makers that the procedure for such contest should contain some safeguard against precipitate action, and the remedy, as a strict matter of right, might be confined to such cases of plain and obvious justice on the part of the contestant, or of force, fraud, bribery, or corruption on the part of the contestee, as that all preliminary votes necessary to the contestant's procedure should, upon a reconsideration thereof, be passed by a three-fifths majority.

The questions propounded to us are somewhat several, and, while the meaning is apparent, there is a little more said than need to be, and it could have been presented in a more condensed form.

The conclusion, however, is that the joint resolution should be presented to the occupant of the executive chair, notwithstanding he is the same man who is spoken of in the notice and other proceedings of contest.  That should he fail to sign it, and return it to the house in which it originated, with his objections, and upon its reconsideration it should fail to receive the vote of three-fifths of the members elected, it fails, so far as that proceeding is concerned.  If he fails to return it and it remains the constitutional time—which I believe is five days—that it then becomes a law, notwithstanding his failure to return it, unless the legislature by adjournment should prevent its return.

This leads us to the conclusion that the resolution, a copy of which is before us, and from which it may be gathered that it has passed the two houses and has the signature of the speaker of the house, and not that of any one purporting to be the presiding officer of the senate, and does not purport to have been presented to the executive—that the meeting of the legislature in joint convention, by virtue of that paper, is not a legal meeting for the purpose of hearing and deciding the contests now pending.

Furthermore, there appears in these papers copies of

resolutions that passed each house for the same purpose. We must say that in neither of these papers, nor the three papers combined, is found sufficient authority for the discharge of the functions of contest by the joint convention.

I believe we were asked to say—at least we feel called upon to say in response to something that was said by counsel—that so far as this resolution is concerned, if it were not for the fact that it fixes a day, I believe the 20th, on which the two houses should meet in joint convention; if it were not for that fact, it could be presented to the lieutenant-governor and with his signature could be presented to the governor and thus evade the necessity of further time in again passing the resolution through the two houses, as it seems to require several days; but as it is, it certainly could not answer the purpose without an amendment changing the time of meeting to some future day, and it would be policy in all events to set that time far enough in advance to give not only the two houses an opportunity to pass upon it on the three several days, if it is deemed necessary to repass it, but also to allow the governor the time constitution gives for its consideration and return, if he desires to occupy the full time.

THE other judges concur.