**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Beverly Marie BROWN, nee Wolfe,**
**Defendant.**

**Crim. No. 71-0-116.**

United States District Court,
D. Nebraska.

Nov. 29, 1971.

William K. Schaphorst, Asst. U. S. Atty., Nebraska, for plaintiff.

George A. Penry, Omaha, Neb., for defendant.

## MEMORANDUM

DENNEY, District Judge.

This matter comes before the Court on the motion of defendant for an order dismissing this criminal action against her on the ground, among others, that the federal government is without jurisdiction over her for the offenses charged. This memorandum considers only the jurisdictional issue raised by defendant's motion and reserves ruling upon the remainder of her motion until additional hearing can be had upon defendant's assertions therein.

Defendant is an American Indian, a member of the Omaha Indian Tribe, and the crimes she is charged to have committed allegedly occurred upon the Omaha Indian Reservation, located primarily in Thurston County, Nebraska.

The charges against defendant arise out of a stabbing incident wherein her sister, Clover Wolfe, was critically injured. These alleged crimes constitute felonies.

Initially, the Court wishes to express appreciation for the diligence of counsel in thoroughly briefing the many legal questions raised in the issue of federal jurisdiction.

The question of the existence of federal jurisdiction over the Omaha Indian Reservation primarily within Thurston County, Nebraska, rests upon the validity and finality of retrocession of jurisdiction by the State of Nebraska to the United States Government after approximately sixteen years of nearly exclusive state control.

In 1953, the Congress transferred all jurisdiction, civil [1] and criminal [2], over

---

1. 67 Stat. 589, 28 U.S.C. § 1360.

2. 67 Stat. 588, 18 U.S.C. § 1162.

the Indian country within the State of Nebraska to the state. At that time, similar withdrawal of federal jurisdiction over the Indian country within other states was also accomplished. The action of Congress in placing jurisdiction over Indians in the hands of the states had as its purpose the elimination of the legal impediments standing in the way of the Indian becoming a first class citizen[3]. Congress apparently assumed that subjecting the Indian to equality of the responsibilities of state law would make him equal in all respects to other citizens of the state.

In 1968, the Congress authorized the United States to take back, via retrocession from Nebraska "all or any measure" of the jurisdiction transferred to the state in 1953[4]. On November 12, 1968, President Lyndon B. Johnson, by executive order[5], pursuant to statutory authority[6], designated the Secretary of Interior to exercise the authority granted by the retrocession statute.

In 1969, the Eightieth Session of the Nebraska Legislature passed Legislative Resolution 37, which ceded all criminal jurisdiction, save for traffic offenses, over the two Indian reservations primarily in Thurston County, Nebraska, to the United States[7]. The Secretary of Interior took jurisdiction over the Omaha Indian Reservation but did not take jurisdiction over the Winnebago Indian Reservation. This assumption of criminal jurisdiction over the Omaha Indians only was published in the Federal Register[8].

In 1971, the Eighty-Second Legislature of Nebraska passed Legislative Resolution 16, wherein it attempted to cancel its cession of jurisdiction because the United States had not taken back all of the jurisdiction set forth in the resolution ceding jurisdiction over both tribal reservations[9].

Two issues arise in relation to the validity of retrocession of jurisdiction to the federal government. First, Resolution 37 was not presented to the governor for his signature and therefore might be invalid under state law. Second, the question has been raised as to the authority of the Secretary of Interior to take back jurisdiction over only one of the reservations retroceded by the state, while rejecting the assumption of jurisdiction over the other.

## THE EFFECT OF THE INVALIDITY OF RESOLUTION 37 UPON FEDERAL JURISDICTION

Article IV, Section 15, of the Constitution of the State of Nebraska[10] would seem to require that a resolution such as Resolution 37 be presented to the Governor for his signature. Resolution 37 was not presented to the Governor of Nebraska, although it appears valid in all other respects.

In the advisory opinion of In re Contest Proceeding[11], the Nebraska Supreme Court considered the validity of a joint resolution of the Nebraska House and Senate calling a joint meeting of the houses to conduct an election contest as to the offices of the governor and lieutenant governor, among other state officers. The Court held that such a resolution was required by substantially the same constitutional provision as now in effect, to be presented to the governor. The Court considered the resolution invalid.

The general tenor of other cases dealing with the above constitutional provision is that the governor constitutes a part of the legislative process in relation

---

3. H.R.Rep.No.848, 83d Cong., 1st Sess. [1953]. S.Rep.No.699, 83d Cong., 1st Sess. [1953].

4. 82 Stat. 79, 25 U.S.C. § 1323. See Appendix A.

5. Executive Order No. 11435, 33 F.R. 17339. See Appendix B.

6. 4 Stat. 738, 25 U.S.C. § 9.

7. See Appendix C.

8. 35 F.R. 16598. See Appendix D.

9. See Appendix E.

10. See Appendix F.

11. 31 Neb. 262, 47 N.W. 923 [1891].

to the presentation of legislative matters to him.

The Court believes, under state law, the resolution would be held invalid. It is possible, however, considering the effect such a ruling would have upon the resolutions of recent decades, many of which have not been so presented, that the Nebraska Court would not so interpret the language of Article IV, section 15.

Assuming the invalidity of Resolution 37 under state law, the effect of such invalidity upon the retrocession of jurisdiction over the Indian country in Thurston County now becomes a determinative issue.

The effect of the invalidity of Resolution 37 could be considered either under state or federal law. The question of which law should be used to determine its effect is peculiarly difficult, since this precise issue has not before arisen in the courts of this land. Perhaps analogy to the somewhat similar area of interstate compacts is appropriate. It should initially be noted that compacts law deals essentially with the specialized law of *contracts* between sovereigns, which is not particularly analogous to the situation presented here. Compacts involve negotiations and the final negotiated agreement as to territorial activities, generally of a continuing nature. What is analogous as between compacts and the problem here presented is the effect of the internal action of a state *externally,* and its impact upon the decisions and activities of other governments.

In the case of Dyer v. Sims [12], the United States Supreme Court was faced with the problem of a West Virginia Supreme Court decision holding that the state legislature had exceeded its constitutional authority in entering into an interstate compact to control pollution upon the Ohio River system.

It was asserted in that case that the decision of the state court was controlling upon the issue of the interpretation of the state constitution and, thus, the validity of West Virginia's participation in and entry into the compact.

The Supreme Court of the United States held that the over-all validity of the compact was to be determined by federal law. The Court went on to interpret the state constitution under federal law. In the present action, interpretation of the state constitution is not necessary, but the principle of applying federal law to the questions there raised has analogous application here.

Much closer to the point now at issue is the situation in Leser v. Garnett [13]. The United States Supreme Court applied federal law to a determination of the effect of the invalidity under state law, of the ratification by the state legislatures of Tennessee and West Virginia of the Nineteenth Amendment to the United States Constitution.

But *Leser* has much broader application to the outcome of the present action than merely to exist as authority for the proposition that federal law should be applied to determine the effect of the invalidity of Resolution 37 upon the validity of retrocession. The Court there noted that where the Secretary of State of the United States had received "official notice * * * duly authenticated * * *" that the two states involved had ratified the proposed amendment, it "was conclusive upon him, and, being certified to by his proclamation, is conclusive upon the courts." [14]

In respect to Resolution 37, the Secretary of Interior received duly authenticated copies thereof and, in reliance thereon, acted to cause assumption of jurisdiction by the federal government over the Omaha Indian Reservation.[15]

12. 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 [1951].

13. 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 [1922].

14. Id. at 137, 42 S.Ct. at 218.

15. See Filing #42.

540

This Court can see no logical distinction between the two situations.

However, even without the authority of *Leser*, this Court would still be compelled to hold that the effect of noncompliance with Article IV, Section 15, of the Nebraska Constitution has no effect upon the assumption of federal jurisdiction by the Secretary of Interior.

■ The federal government exercises plenary power over the affairs of the Indian [16]. Very similar to the traditional "commerce power" although broader in scope, this power of the federal government, when exercised, preempts state control over the field [17].

Questions of momentous impact upon the exercise of federal jurisdiction are at issue here. The Secretary of Interior was presented with what purported to be a valid state "retrocession" of jurisdiction over the Indian country in Thurston County, Nebraska. The question arises as to whether the Secretary must look into the prima facie valid act of a state to determine its validity under state law before he may rely upon it in precipitating federal action. Obviously, such a rule would lead to endless delay and the hazard, in every federal response to state action, that such reliance might, due to the improper conduct of the state officials, be deemed a nullity at a future date. Somewhere along the line, if only for the purpose of finality, such a result cannot be found. Here, the federal government, relying upon what purported to be valid state action, has expended large sums of money and manpower on the Omaha Reservation. It is significant to note the extent to which the valid appearance of Resolution Number 37 has carried itself in the scant two years since its conception.

In State v. Goham [18] and State v. Tyndall [19], the Nebraska Supreme Court determined that retrocession was not ac-

complished due to the fact that the Secretary of Interior had not taken back jurisdiction of both reservations in Thurston County. The effect of Resolution 16 in those two cases was held to be a withdrawal of the proposed retrocession of Resolution 37. The Nebraska Court held that Resolution 16 was effective in withdrawing retrocession without discussing the fact that Resolution 16 was not presented to the governor either. Thus, the issue apparently was overlooked by the Nebraska Supreme Court.

Obviously, the requirements of Article IV, Section 15, were overlooked by the Nebraska Legislature.

This Court takes judicial notice of the fact that the executive branch of the state government in its proceeding before Chief Judge Robinson failed to raise the issue of the validity of the resolution [20]. The Court there, as here, raised the issue *sua sponte*.

The fact that not one of the three branches of the government of Nebraska recognized the possible problem with the resolution indicates the tremendous difficulty which a rule of law requiring the federal government to delve into the procedural validity of state action would place upon any state-precipitated federal response.

It is also apparent that the Congress had determined, after sixteen years of state control that the Indians had, indeed, not become the "first class citizens" that the withdrawal of federal control was supposed to foster.

■ The federal government, having plenary power over the Indians, had the power to prescribe any method or event it desired to trigger its own re-assumption of control over Indian affairs within a state. In fact, the triggering event could have been devoid of any mention of state action at all.

16. *See e. g.* 42 C.J.S. Indians § 70a, pp. 775–779.

17. Anderson v. Gladden, 293 F.2d 463 [9th Cir. 1961], cert. denied, 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344.

18. 187 Neb. 35, 187 N.W.2d 305 [1971].

19. 187 Neb. 48, 187 N.W.2d 298 [1971].

20. Omaha Tribe of Nebraska v. Village of Walthill, 334 F.Supp. 823 [D.Neb.1971].

■ The plenary power of the federal government over Indian affairs, the inescapable difficulty of requiring the Secretary to delve into the internal workings of the state government, and the reliance of the federal government upon what appeared to have been a valid state action, are all factors to be considered and lead the Court to the conclusion that the federal interpretation of the effectiveness of state action triggering the re-assertion of federal jurisdiction is and was controlling. "Retrocession" does not imply any particular procedure or action on the part of the states involved and the need for finality and importance of the various competing interests here dictates that the state action presented complies with the federal requirements of "retrocession."

The federal government, having the power to preempt jurisdiction over the Omaha Reservation, had the power to so define and construe the word "retrocession" as to remove from the determination of federal assumption of jurisdiction any question of the procedural validity or invalidity of the state's act of retrocession. Considering the problems presented by any other holding, the Court holds that the term "retrocession," as determined by the Secretary of Interior, was fulfilled by such action as the state took in Resolution 37.

## THE EFFECT OF THE ASSUMPTION OF JURISDICTION OVER ONE OF THE TWO RESERVATIONS IN THURSTON COUNTY

Subsection (a) of Title 25, Section 1323, U.S.C., reads as follows:

(a) The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of section 1162 of Title 18, section 1360 of Title 28, or section 7 of the Act of August 15, 1953 (67 Stat. 588), as it

was in effect prior to its repeal by subsection (b) of this section.

Two readings logically can be given to the language of this statute. First, it might be read to provide that the state could give back all or any measure of the jurisdiction received in 1953, but that the United States was limited to taking back all or none. Second, it could provide flexibility for both the state and federal governments in allowing the state to give all or any measure of the jurisdiction it had received in 1953 and the federal government to take back all or any measure of the jurisdiction set forth in the resolution of the state legislature.

■ As stated in Daniels v. United States [21], even if statutory language is unambiguous, if

the literal words [of a statute] bring about [a result] "plainly at variance with the purpose of the legislation as a whole", legislative purpose is followed rather than the literal words * * *.

However, the Court finds the language of 25 U.S.C.A. § 1323 ambiguous and reasonably open to the two constructions previously mentioned. Therefore, the rule set forth in Perry v. Commerce Loan Co.[22] applies. Where the language used in a statute is ambiguous, recourse should be had to "legislative purposes."

Unfortunately, from the voluminous debate centered around Public Law 90–284, no floor debate in either the Senate or House covered the effect of the retrocession statute. It is significant to note, however, that Public Law 90–284, of which the retrocession section was a part, is now primarily contained within Chapter 15 of Title 25, which is entitled "CONSTITUTIONAL RIGHTS OF INDIANS." A general discussion of the scope of Chapter 15 must note that Subchapter I deals basically with the extension to Indians of most of those basic rights provided for in the Bill of Rights

21. 210 F.Supp. 942, 949–950 [D.Mont. 1962], affirmed, 372 U.S. 704, 83 S.Ct. 1018, 10 L.Ed.2d 124 [1963].

22. 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed. 2d 827 [1966].

to the United States Constitution. The tribe, in its government of tribal affairs, is now bound to observe those rights.

Subchapter II provides for the establishment of a model evidentiary code for Indian courts of justice to assure the basic rights of those accused of crimes and on trial therein.

Subchapter III concerns itself with jurisdiction over offenses committed by or against Indians in Indian country. Among other provisions, the subchapter requires that states not presently having jurisdiction may acquire civil [23] or criminal [24] jurisdiction over the Indian country within the state *"with the consent of the Indian tribe occupying the particular Indian country or part thereof"* over which jurisdiction is to be exercised [emphasis added]. The manner of obtaining such consent is by approval of the majority of enrolled adults of the tribe voting at a special election [25]. This subchapter also provides for retrocession by any state of jurisdiction to the United States [26].

Subchapter IV concerns the supplying of free legal counsel and Subchapter V concerns the updating and compilation of materials concerning the law dealing with Indians.

The review of this chapter clearly indicates that Congress intended to offer the Indian peoples a fair share of America's freedoms, privileges and responsibilities. The interests of the two governments involved should be considered, but the interests of the people most affected by these events should weigh heavily in a determination of what was intended by the language used in 25 U.S.C.A. § 1323. Specifically with reference to jurisdiction, it would be anomalous if Congress made provision for the assertion of the desires of Indians with reference to the consent requirements of §§ 1321 and 1322 but left the United States no method of considering those desires of individual tribes in #1323. If that section is not construed to give the United States the flexibility to choose between the assumption of jurisdiction over two different reservations within a state where the state retrocedes both to the federal government, then the desires of the individual Indian tribes could not be considered. In fact, that is precisely the situation involved in the Nebraska retrocession. The Winnebago Indians wished to remain under the criminal jurisdiction of the State of Nebraska.[27] The Omaha Indians wished to be returned to the criminal jurisdiction of the United States.[28] In order to further these desires, the Secretary of Interior, with the consent of the Legislative Council of the Nebraska Unicameral,[29] that body having been given the authority to deal with the federal government in relation to the effectuation of the retrocession by the explicit terms of Resolution 37, assumed criminal jurisdiction over the Omaha Reservation only, leaving the Winnebago Reservation to the state.

■■ The overall purpose of Chapter 15 of Title 25 U.S.C.A. and, specifically, that subchapter dealing with jurisdiction, was to benefit the Indian. It surely was not to make the Indian a political ping-pong ball between the state and federal governments. For these reasons, the Court interprets the provisions of 25 U.S.C.A. § 1323 to mean that the United States may assume all or any measure of the jurisdiction retroceded by a state as well as allowing the state to offer all or any measure of the civil or criminal jurisdiction acquired in 1953. This means that the action of the Secretary of Interior in assuming criminal jurisdiction over the Omaha but not the Winnebago Indian Reservation was within the authority provided by the statute.

23. 82 Stat. 79, 25 U.S.C. § 1322.

24. 82 Stat. 78, 25 U.S.C. § 1321.

25. 82 Stat. 80, 25 U.S.C. § 1326.

26. 82 Stat. 79, 25 U.S.C. § 1323.

27. See Filing #38 and attached exhibits in Criminal No. 71–0–116.

28. Id.

29. Id.

Further weight is added to this position by the fact that this construction was given to the language of the statute by the Secretary of Interior.

The Supreme Court held in Udall v. Tallman,[30] dealing with the construction of ambiguous executive orders that

> [t]he Secretary's interpretation may not be the only one permitted by the language of the orders, but it is quite clearly a reasonable interpretation; courts must therefore respect it. [cites omitted].

Again, at page 16 of that opinion, at page 801 of 85 S.Ct., the Court stated:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.

The interpretation given by the Secretary of Interior to this statute was quite clearly a reasonable one and should be given great weight in the determination of its meaning. *See* DeMarrias v. South Dakota.[31]

Also, as noted in Hopkins v. United States,[32] "statutes affecting the rights of Indians are generally to be construed in their favor * * *." The rights of the Omaha Tribe as to any effect being given their desires would be disregarded if the construction given § 1323 by the Secretary and this Court was rejected.

The Court therefore finds that the construction which most properly approaches the intent of Congress allows the state to retrocede all or any measure of the jurisdiction it acquired in 1953 and the United States to assume all or any measure of the jurisdiction retroceded by the state.

The nature of this determination was set forth by the esteemed Judge Learned Hand in United States v. Klinger,[33] wherein he wrote:

> When we ask what Congress "intended," usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion. He who supposes that he can be certain of the result is the least fitted for the attempt.

An order denying defendant's motion to dismiss for want of jurisdiction will be filed contemporaneously with this Memorandum.

## APPENDIX A

82 Stat. 79, 25 U.S.C. § 1323.

§ 1323. Retrocession of jurisdiction by State. (a) The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of section 1162 of Title 18, section 1360 of Title 28, or section 7 of the Act of August 15, 1953 (67 Stat. 588), as it was in effect prior to its repeal by subsection (b) of this section.

(b) Section 7 of the Act of August 15, 1953 (67 Stat. 588), is hereby repealed, but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal.

Pub.L. 90–284, Title IV, § 403, Apr. 11, 1968, 82 Stat. 79.

---

30. 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L. Ed.2d 616 [1965].

31. 319 F.2d 845 [8th Cir. 1963].

32. 414 F.2d 464, 472 [9th Cir. 1969].

33. 199 F.2d 645 [2d Cir. 1952], affirmed, 345 U.S. 979, 73 S.Ct. 1129, 97 L.Ed. 1393 [1953].

544

APPENDIX B

EXECUTIVE ORDER NO. 11435

Nov. 21, 1968, 33 F.R. 17339

DESIGNATING SECRETARY OF INTERIOR TO ACCEPT RETROCESSION OF JURISDICTION BY STATE

By virtue of the authority vested in me by section 465 of the Revised Statutes (25 U.S.C. § 9) [section 9 of this title] and as President of the United States, the Secretary of the Interior is hereby designated and empowered to exercise, without the approval, ratification, or other action of the President or of any other officer of the United States, any and all authority conferred upon the United States by section 403(a) of the Act of April 11, 1968, 82 Stat. 79 (25 U.S.C. § 1323(a)) [subsec. (a) of this section]: *Provided,* That acceptance of retrocession of all or any measure of civil or criminal jurisdiction, or both, by the Secretary hereunder shall be effected by publication in the FEDERAL REGISTER of a notice which shall specify the jurisdiction retroceded and the effective date of the retrocession: *Provided further,* That acceptance of such retrocession of criminal jurisdiction shall be effected only after consultation by the Secretary with the Attorney General.

Lyndon B. Johnson

APPENDIX C

NEBRASKA LEGISLATIVE JOURNAL P. 1467

LEGISLATURE OF NEBRASKA

EIGHTIETH LEGISLATURE

FIRST SESSION

LEGISLATIVE RESOLUTION 37

Introduced by C. W. Holmquist, 16th District

WHEREAS, the State of Nebraska was given civil and criminal jurisdiction over Indians and Indian territory in this state by the Act of Congress of August 15, 1953, generally known as Public Law 280; and

WHEREAS, the assumption of such jurisdiction has led to steadily increasing costs for law enforcement in certain counties of Nebraska, and particularly in Thurston County; and

WHEREAS, because of restrictions in original grants of land in Thurston County to Indians and Indian tribes, Thurston County has not had a sufficient tax base to meet the increasing costs of law enforcement; and

WHEREAS, since 1957, state assistance has been provided for law enforcement purposes in Thurston County, and the cost of this assistance has increased each biennium; and

WHEREAS, Public Law 90-284 adopted as an Act of Congress on April 11, 1968, contains a number of provisions dealing with civil rights and jurisdiction of Indians; and

WHEREAS, Section 403(a) of Public Law 90-284 provides that the United States is authorized to accept a retrocession of all or any measure of the jurisdiction acquired by a state pursuant to Public Law 280 of 1953; and

WHEREAS, a committee of members of the Legislature appointed by the Executive Board of the Legislative Council following adoption of Public Law 90-284 has studied the problems of law enforcement in Indian areas of this state and the question of a retrocession of jurisdiction, and has met with leaders of the Omaha and Winnebago tribes, county officials, and officials of the Bureau of Indian Affairs.

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE NEBRASKA LEGISLATURE IN EIGHTIETH SESSION ASSEMBLED:

1. That the State of Nebraska hereby retrocedes to the United States all jurisdiction over offenses committed by or

against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to Public Law 280 of 1953, except as provided in paragraph 2 of this resolution.

2. That the retrocession of jurisdiction contained in paragraph 1 of this resolution shall not apply to any offenses involving the operation of motor vehicles on public roads or highways.

3. That the Executive Board of the Legislative Council is hereby authorized and directed to take all necessary action to put this resolution into effect, such action to include arrangements with the Department of the Interior and the department's Bureau of Indian Affairs concerning the assumption of law enforcement responsibilities in the areas of Indian country covered by this resolution.

## APPENDIX D

### NOTICE OF ACCEPTANCE OF RETROCESSION OF JURISDICTION
### 35 F.R. 16598

Pursuant to the authority vested in the Secretary of the Interior by Executive Order No. 11435 (33 F.R. 17339), I hereby accept, as of 12:01 a. m., e. s. t., October 25, 1970, retrocession to the United States of all jurisdiction exercised by the State of Nebraska over offenses committed by or against Indians in the areas of Indian Country located within the boundaries of the Omaha Indian Reservation in Thurston County, Nebraska . . . except offenses involving the operation of motor vehicles on public roads or highways which retrocession was tendered and offered by Legislative Resolution No. 37 passed by the Legislature of Nebraska in 80th regular session on the 16th day of April, 1969.

   *    *    *    *    *    *

/S/ Walter J. Hickel
Secretary of Interior

## APPENDIX E

### LEGISLATURE OF NEBRASKA
### EIGHTY-SECOND LEGISLATURE
### FIRST SESSION

---

### LEGISLATIVE RESOLUTION 16

Introduced by C. W. Holmquist, 16th District

---

WHEREAS, the Eightieth Session of the Nebraska State Legislature, 1969, adopted Legislative Resolution 37, relating to the retrocession to the United States of jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to Public Law 280 of 1953; and

WHEREAS, the United States has not accepted retrocession in accordance with the terms and provisions of said Legislative Resolution 37.

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE EIGHTY-SECOND LEGISLATURE OF NEBRASKA, FIRST SESSION:

1. That the action of the Eightieth Session of the Nebraska State Legislature, 1969, approving Legislative Resolution 37 is rescinded, and the offer of retrocession therein contained is withdrawn.

2. That a duly attested copy of this resolution be transmitted by the Clerk of the Legislature to the Secretary of Interior of the United States.

/S/ Frank Marsh
PRESIDENT OF THE LEGISLATURE

I, Vincent D. Brown, hereby certify that the foregoing is a true and correct copy of Legislative Resolution 16, which was passed by the Legislature of Nebraska in Eighty-second Legislature,

First Session, on the first day of February, 1971.

/S/ Vincent D. Brown

CLERK OF THE
LEGISLATURE

APPENDIX F

Article IV, Section 15, of the Constitution of the State of Nebraska, reads as follows:

Sec. 15. Bills and resolutions to be presented to Governor; approval; procedure; disapproval of items of appropriation. Every bill passed by the legislature, before it becomes a law, and every order, resolution or vote to which the concurrence of both Houses may be necessary (except on questions of adjournment) shall be presented to the Governor. If he approves he shall sign it, and thereupon it shall become a law, but if he do (sic) not approve, he shall return it with his objections to the house in which it shall have originated, which house shall enter the objections at large upon its journal, and proceed to reconsider the bill. If then three-fifths of the members elected agree to pass the same it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by three-fifths of the members elected to that house, it shall become a law, notwithstanding the objections of the governor. In all such cases the vote of each House shall be determined by yeas and nays, to be entered upon the journal. Any bill which shall not be returned by the governor within five days (Sundays expected) (sic) after it shall have been presented to him, shall become a law in like manner as if he had signed it; unless the legislature by their adjournment prevent its return; in which case it shall be filed, with his objections, in the office of the secretary of state within five days after such adjournment, or become a law. The governor may disapprove any item or items of appropriation contained in bills passed by the legislature, and the item or items so disapproved shall be stricken therefrom, unless repassed in the manner herein prescribed in cases of disapproval of bills.

Note: The Nebraska Legislature has become a Unicameral since the enactment of the above section and a general amendatory constitutional provision specifies that wherever two houses are referred to, the reference should be changed to read a single house.