**MONTANA BANK OF CIRCLE, N.A.**

v.

**The UNITED STATES.**

**FORT BELKNAP INDIAN COMMUNITY, et al.**

v.

**The UNITED STATES.**

**Nos. 328–77, 500–81L.**

United States Claims Court.

March 14, 1985.

Thomas E. Towe, Billings, Mont., for plaintiff in docket No. 328–77; Towe, Ball, Enright & Mackey, Billings, Mont., of counsel.

Francis X. Lamebull, Harlem, Mont., for plaintiff in docket No. 500–81L.

Stephen G. Anderson, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

HARKINS, Judge:

The Montana Bank of Circle, N.A. (Bank) is a national banking corporation whose remaining claims in these consolidated cases are based primarily on alleged acts and omissions of the Bureau of Indian Affairs (BIA). Bank's claims are asserted to have accrued to it directly, and also to Fort Belknap Indian Community (FBIC) (plaintiff in docket No. 500–81L) and to FBIC's wholly owned corporation, Fort Belknap Builders (Builders). The FBIC is an Indian chartered corporation comprised of the Gros Ventre and Assiniboine Indian Tribes.

Bank's petition (No. 328–77), filed in the United States Court of Claims on June 9, 1977, sought recovery on nine separate counts. On October 16, 1978, the Court of Claims dismissed Counts IV through IX, and remanded Counts I, II and III for further proceedings. Docket No. 328–77 was suspended on August 20, 1979, pending resolution of a case in Montana state courts (*First National Bank of Circle, N.A. v. Fort Belknap Indian Community, et al.*, No. 2806, District Court, Seventh Judicial District of Montana). On April 1, 1981, after settlement of the state court action, the suspension in docket No. 328–77 was lifted.

FBIC's petition (No. 500–81L), filed in the United States Court of Claims on August 14, 1981, sought recovery on nine separate counts. On August 6, 1982, the Court of Claims dismissed Counts II through IX and remanded Count I for further proceedings.

Counts II through IX of docket No. 500–81L alleged the existence and breach by BIA of a trust relationship with FBIC. On these counts, the Court of Claims held that the FBIC had no money claim against the United States based upon an alleged breach of fiduciary duty because the statute the Indians relied upon, 25 U.S.C. § 81 (1976), if it were shown the United States had approved contracts that later turned out to be unwise or improvident, did not mandate compensation. This decision was based upon the concepts of liability for breach of fiduciary obligations that had been enunciated in *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (Mitchell I).

In both cases, Count I alleges breach of an agreement by the BIA to lease 10,000 square feet of temporary office space from FBIC for $12,000 per year. Counts II and III of docket No. 328–77 also allege breaches of fiduciary obligations owed by the United States to FBIC.

Both cases were transferred to the United States Claims Court on October 1, 1982, pursuant to section 403(d) of the Federal Courts Improvement Act of 1982. 28 U.S.C. § 171, n. (1982). On April 22, 1983, in docket No. 328–77, defendant filed a motion for summary judgment as to Counts II and III, citing the Court of Claims decision in docket No. 500–81L. On April 25, 1983, docket No. 500–81L was consolidated with docket No. 328–77 for purposes of trial of Count I. Trial was held on June 14–15, 1983; briefing on defendant's motion for summary judgment on Counts II and III was completed on October 18, 1983, and posttrial briefing on Count I was completed January 17, 1984.

In each case, Count I seeks the recovery of $72,000 for breach of contract. Bank argues, alternatively, that it had a contract with BIA, that it is the third party beneficiary of a contract between FBIC and BIA and that it is the assignee of Builders and FBIC's rights under contracts with, or approved by, BIA. FBIC asserts that BIA leased 10,000 square feet of temporary office space in 1970 and has breached the contract by failure to pay pursuant to the

lease. For the reasons that follow, neither Bank nor FBIC are entitled to recover on Count I, and defendant is entitled to prevail on its motion for summary judgment on Counts II and III of docket No. 328–77.

## FACTS

Before 1969 and continuing into 1970, unemployment on the Fort Belknap Indian Reservation was chronic. Out of 605 employable persons, only 198 actually were employed. Mechanization of farming increased rural unemployment and no large industries or cities were located near the reservation. At the same time there was a chronic need for housing. A majority of houses on the reservation were primitive and were overcrowded. With a grant and loan from the Economic Development Agency (EDA), an industrial park was put under construction on the reservation. With assistance of funds from the Office of Economic Opportunity (OEO), the tribal attorney contactedvarious companies to encourage an industry to locate on the reservation. The FBIC began negotiations with Fairchild-Pola International, Inc. of Houston, Texas, to establish a prefabricated home building industry on the reservation.

In January 1970, with the knowledge and approval of the BIA, the FBIC under its charter created a new organization, Builders. Later, Builders was incorporated under the laws of Montana. The members of the FBIC Tribal Council served as Builders' Board of Directors. Management of Builders was to be provided by a separate, non-Indiana, corporation known as Economic Consultants, Inc. (ECI), which entered into a management service contract with Builders. ECI was a corporation made up primarily of Steve Long, formerly of Fairchild-Polo, and a Missoula attorney named Vernon Hoven.

An exclusive license was granted to FBIC by Fairchild-Polo to use its patents and patent rights in Montana in the design and construction of certain pre-engineered buildings and structures under the trade name "Fairchild-Polo Homes." Builders was to exercise the licensed patent rights.

FBIC planned to borrow $350,000; of that amount, $150,000 was to be used to construct a large factory building, and $200,-000 was to be given to Builders as operating capital for manufacturing prefabricated housing.

In January and February 1970, the BIA reviewed, suggested modifications, and approved (1) the charter and by-laws of Builders, (2) a management agreement between Builders and ECI, (3) an operating agreement between Builders and ECI, and (4) a license agreement between FBIC and Builders. Contact was made by FBIC with First National Bank of Great Falls to obtain financing for the new prefabricated housing business. The loan was discussed and arranged at a meeting held in the BIA Area Director's office on January 29, 1970.

As an inducement to First National Bank of Great Falls to make the loan, the BIA agreed in these discussions to lease office space in the building that was to be constructed with funds from the loan, with the proceeds from the lease to be assigned to the lending bank. This agreement was articulated in a letter dated February 2, 1970, from BIA's Billings Area Office to the president of FBIC. The letter stated:

The Bureau of Indian Affairs hereby agrees to rent 10,000 square feet of temporary office space from the Fort Belknap Indian Community for $12,000 per annum, subject to the following conditions:

1. That it is necessary in qualifying for the loan from the First National Bank for building and operating expenses connected with the Fort Belknap Builders.

2. That the Fort Belknap Community will provide a minimum of 10,000 square feet of office space sub-divided in a manner agreeable to the Bureau of Indian Affairs.

3. That the Fort Belknap Community will provide all water, heat, air conditioning, maintenance, landscaping, and parking facilities needed for the conduct of Bureau business at the Fort Belknap Agency.

4. This agreement may be terminated upon mutual agreement between the Fort Belknap Community and the Bureau of Indian Affairs.

Negotiations with the First National Bank of Great Falls broke down and the First National Bank of Circle (plaintiff in docket No. 328–77) was asked to make the loan. In a letter dated March 18, 1970, Bank's president notified FBIC's tribal attorney that it would make the loan on condition that supporting documents were provided. Supporting documents were identified in 23 items; item 5 stated:

5. An assignment of a five year lease from the Bureau of Indian Affairs for rental of 10,000 square feet of space in the new building which is the subject of this loan, and including any renewals of said lease.

On March 24, 1970, the BIA Acting Area Director wrote to Bank's president that several officials of the Billings Area staff had met with officials of FBIC and officers of ECI to discuss Bank's proposal to loan $350,000 to FBIC. The letter assured Bank that resolutions authorizing FBIC to borrow the money were approved by the area office and that necessary approval from Washington had been requested, and that approval should be received "quite soon." The letter commented upon BIA's lease of office space in the building to be constructed, as follows:

The matter of the BIA leasing office space in the proposed building was discussed at some length. The BIA is prepared to rent office space from the Tribe contingent upon negotiation of a satisfactory agreement and subject to availability of funds from appropriations by the Congress. A copy of our letter of this date to the Tribal Chairman with reference to renting office space is attached.

The referenced letter to FBIC, also dated March 24, 1970, stated it was BIA's intent to negotiate for a lease of sufficient general purpose office space, including utility and janitorial services, in a suitable building to be constructed by FBIC. This letter described the arrangements as follows:

Present estimates are that approximately 10,000 square feet of gross space will be required, or approximately 8,000 square feet of net useable space at not to exceed average current rental costs of fully serviced office space in Montana, subject to the limitation of Section 322 of the Economy Act of 1932, as amended (40 USC 2781). The current budget available for office maintenance is $12,000 per annum. When an acceptable offer and award of contract is negotiated, a standard form of U.S. Government lease for real property will be executed for an initial term of five years and including an option for the Government to renew for an additional five year term. The lease will provide for automatic renewal from year to year without further notice provided that adequate appropriations by the Congress are available from year to year for the payment of rentals. The lease will provide that the Assignment Claims Act of 1940 (31 USC 203, 41 USC 15) will apply.

A commitment from BIA to enter a lease for office space was a prerequisite for Bank to make the loan to FBIC. Prior to making the loan to FBIC, Bank was presented both BIA's February 2, 1970, letter and its March 24, 1970, letter to FBIC. Bank relied on the February 2, 1970, letter as a binding commitment on the part of BIA to lease office space in the building to be built with proceeds from the loan.

On April 1, 1970, Bank disbursed a loan of $350,000 to FBIC. At that time, no building was in existence, and no document had been executed by the BIA and FBIC that leased space in the building, to become effective when the building was completed. Bank recognized there was no lease and that no lease would be made until the building was completed.

The loan was closed with a statement of intent from FBIC that a copy of the lease and the assignment would be furnished "as soon as possible." By letter dated June 26, 1970, Bank reminded Gordon Hoven, the tribal attorney, that the lease and assignment had not been furnished, and that it

understood that the lease and assignment would be made shortly after completion of the building.

The building was completed by October 1, 1970. Builders moved into the building under a lease from FBIC and occupied the only office space that was finished when the building was completed. Builders occupied the entire building until approximately October 1, 1971. During this period there was insufficient room to accommodate both Builders' operations and office space for BIA.

Although the loan funds had been dispersed on April 1, 1970, a formal loan agreement between the Bank and FBIC was not executed until December 3, 1970. Execution of a formal loan agreement was requested by BIA. The loan agreement was approved by the Billings Area Office on February 26, 1971. The loan agreement recited that the parties had negotiated and Bank had loaned to FBIC $350,000 at 10% interest per annum payable in 16 equal semi-annual installments. Paragraph 5 of the loan agreement stated:

> 5. Belknap shall assign all of its right, title and interest in and to any income resulting from a lease, maintenance or other contract referred to or contemplated by a certain letter of intent from the Bureau of Indian Affairs dated February 2, 1970, and attached hereto as Exhibit "A" for the repayment of said loan.

Builders was an unsuccessful enterprise; during its existence it received only one contract, for construction of 20 homes on the reservation. By October 1971, Builders was in severe financial trouble and ceased operations shortly thereafter. After Builders vacated, the building remained virtually vacant until 1973, when members of FBIC moved in.

At the time Builders vacated the building in October 1971, approximately 1,800 square feet of office space had been completed. Other parts of the building were used as storage. In the area that had been designated in original plans for BIA offices, some partitions had been installed. The partitions were unfinished and the area was unsuitable as office space without modification.

The building contained 10,000 square feet of space that could have been available for offices. Original plans for the building called for the offices to be built for BIA on two levels along the entire width of the building. Office space that conformed with these plans never was made available.

The lease agreement referenced in the February 2, 1970, letter never was performed. BIA never entered into a lease for office space in the building that was built from funds disbursed by plaintiff Bank on April 1, 1970, and covered by the loan agreement signed by the parties on December 3, 1970.

After Builders had vacated the building, representatives of BIA and FBIC discussed the additional work that would be needed to make the offices useable by BIA. FBIC then discussed with Bank the matter of an additional loan that would be needed to complete the modifications. A formal loan application was not submitted after these discussions, however, because FBIC believed Bank would insist upon conditions that would be unacceptable. Also, at that time FBIC was more concerned with other matters related to Builders and its existing debt to Bank.

After the demise of Builders, efforts of the representatives of FBIC and BIA were directed to finding a way to improve FBIC's financial condition. The prospect of borrowing money to renovate the industrial building into offices for BIA was not as promising as other efforts. Eventually BIA did loan FBIC $210,000 for the purpose of repaying Bank. BIA later leased office space, in a different building, from FBIC.

FBIC never took affirmative action to get BIA to move into the building. At no time did the building have enough finished office space to meet BIA's 10,000 square foot requirement. During the period Builders occupied office and storage space in the building, and during the period of discus-

sions with FBIC relative to a possible loan to modify the building with additional office space, no one from Bank complained to BIA about its failure to lease or to utilize space in the building. BIA did not supply plans or specifications to FBIC that described how space in the building was to be subdivided.

At the time the building was completed, the parties were concerned with problems incident to Builders' startup operations, and none of the parties sought BIA occupancy or lease of the building. Subsequently, BIA and the Bank were concerned with conditions that resulted from Builders' demise, and none of the parties actively pursued BIA occupancy and lease of the building as a remedy for those conditions. By January 1972, none of the parties intended to complete installation of office space adequate for occupancy of the building by BIA.

## DISPOSITION

### Count I

In this litigation, the Count I claim has been presented variously by the parties as a situation that centered upon two-party contracts. Bank argued the facts established, alternatively, that it had a direct contract with BIA, that it was a third party beneficiary to an existing lease between BIA and FBIC, or it was the assignee of Builders' and FBIC's rights under a contract between BIA and FBIC. In docket No. 500–81L, FBIC asserted the BIA had leased 10,000 square feet of office space for $12,000 per year, and that its contract was breached on BIA's failure to pay pursuant to that lease. Defendant, on the other hand, denied any enforceable contract came into existence, and that the lease arrangements only involved two parties, BIA and FBIC.

Consideration of the testimony at trial and analysis of the documents exchanged by the parties suggests a three-party agreement in which the BIA, Bank and FBIC initially agreed that BIA and FBIC subsequently would execute a lease, the proceeds of which would be assigned to Bank. At the conclusion of trial findings were announced that the evidence established an enforceable contract had been made to enter into a second contract at a subsequent time, that BIA had authorized the initial contract and that Bank had relied upon the contract to make a contract when it disbursed $350,000 to Builders.

■ The initial three-party agreement is not embodied in a single instrument. Its terms are encompassed in the following documents:

1. BIA's February 2, 1970, letter to the president of FBIC;

2. BIA's March 24, 1970, letters to Bank and to FBIC; and

3. the loan agreement executed by Bank and FBIC on December 3, 1970, and approved by BIA on February 26, 1971, that memorialized the April 1, 1970, disbursement.

The initial three-party contractual relationship was negotiated over a substantial period of time; it is supported by mutual promises; and its obligations were intended to be binding on each of the parties. BIA's participation in the organization of Builders and in the negotiations with Bank was to persuade Bank to make the loan to FBIC so that Builders could enter the prefabricated housing business. BIA's agreement to enter a lease at a later time was a prerequisite for Bank to make the loan to FBIC.

■ Defendant excepts to the finding that the initial contract to make a contract is enforceable. Defendant asserts that FBIC never made a reciprocal promise to lease the building office space to BIA, and not to someone else. FBIC's acceptance of Bank's funds on April 1, 1970, and its execution of the loan agreement on December 3, 1970, manifest its concurrence in the arrangements for a lease by BIA. FBIC's agreement to rent office space to BIA is implicit in the arrangements undertaken by the parties to start Builders in a prefabricated housing business.

When the Count I claims previously were before the Court of Claims, defendant argued the 6-year statute of limitations (28 U.S.C. § 2501 (1976)) was a bar, on the ground that FBIC and Bank had asserted the February 2, 1970, letter was an existing lease. The Court of Claims did not accept defendant's limitations argument for the reason that plaintiffs might be able to show a continuing claim for rent accruing under that lease.

Defendant now points out, since the facts have been analyzed and recast to show an initial contract to be followed by a subsequent lease contract, that the limitations bar would apply to a claim for breach of the three-party contract, if such breach occurred prior to June 9, 1971. Defendant argues that the three-party agreement anticipated that the lease would be executed shortly after completion of the building, and that any breach must have occurred on BIA's failure to execute a lease by that time, at least by early 1971. Inasmuch as such a breach must have occurred prior to June 9, 1971, defendant contends, the claims in Count I now are barred.

■ An action for breach of the three-party contract would not accrue until the conduct of the parties showed that BIA and FBIC impermissibly had failed to execute a lease. In this case, the statute of limitations would begin to run, and a claim against the United States would first accrue, at the time the BIA and FBIC failed to execute a lease after the contract conditions were satisfied. A breach would occur either (1) at the time BIA refused to enter into a lease or, (2) a reasonable period of time after satisfactory available facilities were offered, and BIA failed to execute a lease. Neither such event took place prior to June 9, 1971.

After the demise of Builders in October 1971, representatives of BIA and FBIC discussed the additional work that would be necessary to make the offices useable by BIA. At that time, FBIC's officers discussed the matter with Bank, and all parties recognized that an additional loan would be needed to complete such modifica-

tions. It is clear that, at the time of these discussions, the absence of a lease, and the failure of BIA and FBIC to have executed a lease, were not viewed by the parties as a breach. Any breach of the three-party contract, if a breach occurred, took place after June 9, 1971. A cause of action for such a breach, accordingly, would be within the limitations period.

■ A lease for BIA office space in the building that was constructed from funds supplied through the three-party contract never was executed. This failure of BIA and FBIC to enter a formal lease agreement was not a breach of the contract to make a contract. BIA never became obligated to occupy the premises because there was no compliance with the conditions for BIA occupancy that were defined in the February 2, 1970, letter.

It is uncontroverted that the building never contained 10,000 square feet of office space that reasonably would be adequate for BIA use. It is true that some space had been partitioned in the area that originally had been designated for BIA offices. In addition, Builders knew how much office space was needed by BIA. The offices were not completed, however, and the area that had partitions was not suitable for use by BIA without additional construction. The only offices that in fact were completed were those needed and used by Builders in its operations.

The failure to provide adequate office space did not result from a failure by BIA to supply additional plans and detailed specifications. BIA's needs generally were known by Builders, BIA did not prevent Builders from installing offices initially, and it did not prevent FBIC from undertaking the additional construction that was needed to make the space useable after Builders' demise. The BIA office space was not provided initially because the parties were concerned with problems involved in Builders' startup, and, later, modification of the existing building was prevented by lack of funds, and concern of the parties for other pressing matters.

The failure of BIA to execute a lease was not a breach by the three-party agreement because FBIC never made adequate space available, and BIA is not responsible for the failure to provide such space.

■ On the facts adduced at trial, after the funds were disbursed to FBIC, the intentions of the parties changed and the objective of the initial contract, insofar as obligations to enter a lease subsequently are concerned, were abandoned. The changes in the parties' intentions are made manifest by their conduct. Abandonment of a contract is a question of fact that may be shown by a written contract, verbal agreement or by acts and conduct. An abandonment of rights under a contract can occur by conduct that clearly indicates such purpose. An actual intent to abandon must exist, and such intent is to be ascertained from the facts and circumstances involved. *See S.S. Silberblatt v. Seaboard Surety Co.*, 417 F.2d 1043, 1054 (8th Cir. 1969); *see generally* Restatement (Second) of Contracts § 283 comment a (1981); 17A C.J.S. *Contracts* § 412 (1963); 17 Am. Jur.2d *Contracts* § 484 (1964).

When the building was completed in October 1970, FBIC leased the entire building to Builders, including the space that in the original plans had been designated for BIA's offices. When Builders occupied the building in October 1970, and until it vacated the premises in October 1971, the fact that Builders used the entire building under a lease from FBIC was known, and consented to, by BIA and the Bank. Builders' decision to complete only the number of offices it needed was made when it started to use the building, and this method of using the building was known by BIA, FBIC and Bank.

Builders' lease and occupancy of the entire building for almost a year, without completion of offices suitable for BIA use, was done with BIA's approval, and with FBIC's and Bank's concurrent knowledge and acceptance. This conduct is inconsistent with a contention that BIA's failure to execute a lease shortly after the building was completed constitutes a breach of the initial contract.

■ In the circumstances that developed after the building was completed and occupied by Builders, it is apparent that the parties abandoned the lease commitment in the initial contract. None of the parties sought BIA's occupancy or lease of the building during the period of Builders' occupancy. During the period after Builders' demise, when the parties discussed the need for additional loans in order to complete construction of office space suitable for BIA occupancy, the matter of BIA leasing space was not pressed.

In its Count I claim, Bank alleges, alternatively, it can prevail in the status of third party beneficiary. In previous stages of this litigation, Bank's status as a third party beneficiary was based on an existing lease between BIA and FBIC, assertedly evidenced by the February 2, 1970, letter. In its posttrial brief, Bank bases its third party beneficiary status on an alleged two-party agreement between BIA and FBIC to enter into a lease at a future date. Bank asserts that after it had accepted third party beneficiary status by making the loan, FBIC and BIA could not terminate this agreement or otherwise fail to enter into a lease, without being liable to Bank for damages. Bank relies upon the principle that after the third party has made a material change in position in reliance upon a promise in a contract, the change of position precludes the parties from discharge or variation of the contract without the beneficiary's consent. 17 Am.Jur.2d *Contracts* § 318 (1964); Williston on Contracts § 397 (3d ed. 1959).

■ The concepts involved in allowing an individual who is not a party to an agreement to invoke its provisions in a claim for damages are nebulous, and the law that has developed is confused. *Ables v. United States*, 2 Cl.Ct. 494, 499 (1983), *aff'd mem.*, 732 F.2d 166 (Fed.Cir.1984). The Court of Claims has established that in an appropriate case an intended third party beneficiary of a Government contract may maintain an action under 28 U.S.C. § 1491.

*Hebah v. United States,* 428 F.2d 1334, 1340 (Ct.Cl.1970); *Deltec Corp. v. United States,* 326 F.2d 1004 (Ct.Cl.1964); *see also Bogart v. United States,* 531 F.2d 988 (Ct. Cl.1976). An individual who is not a party to a contract, however, does not have a right to sue for breach of that contract merely because he would benefit from its performance or because it would be beneficial for him to have such right. *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912); *Ables v. United States,* 2 Cl.Ct. at 500. The requisite intent for third party beneficiary status is not a desire or purpose to confer a benefit on a third person, nor a desire to advance his interests. There must be a showing of an intent that the promisor shall assume a direct obligation to the third party. *McDonald Constr. Co. v. Murray,* 5 Wash.App. 68, 485 P.2d 626 (Wash.1971); *Vikingstad v. Baggott,* 46 Wash.2d 494, 282 P.2d 824 (Wash.1955).

■ Bank's theory as to its status as a third party beneficiary does not fit the facts of this case. Bank was a party, not a third party beneficiary, to the initial contract that BIA and FBIC subsequently would enter into a lease. Arguably, if a subsequent lease had been made, Bank could be viewed as a third party beneficiary to that agreement. In such event, however, item 4 of the February 2, 1970, letter expressly provided that the contract could be terminated by mutual agreement of BIA and FBIC. This power was reserved expressly and could be exercised by FBIC and BIA without regard to its effect on Bank as a third party beneficiary.

■ BIA, however, never became obligated to enter into possession of the premises, and no lease between BIA and FBIC ever was executed. Even if it is assumed that the initial agreement was a two-party contract between BIA and FBIC, a subsequent failure of the lease to come into existence, or the failure of BIA to occupy the premises, would not be a breach. BIA's failure to enter a lease for office space is excused because the conditions stated in paragraph 2 of the February 2, 1970, letter were not met.

In addition, the facts show Bank consented to the changes that resulted in the failure of a lease agreement to come into existence. Bank's conduct shows an acquiescence for a year to Builders' use of the building for its prefabricated housing business and its possession of the only office space that was completed. After Builders' demise, Bank and FBIC could not agree on a further loan of funds necessary to finance the additional work that would be needed to make the office space acceptable to BIA.

■ In its Count I claim, Bank also, in the alternative, relies upon the assignment by FBIC pursuant to paragraph 5 of the loan agreement of any income resulting from the lease, and on the assignment by Builders on July 8, 1970, of all money that may become due and payable to Builders. Neither an assignment from Builders nor from FBIC advances Bank's Count I claim, and no recovery is permissible through these assignments. There was no income from a lease, and BIA never became obligated to enter a lease or to occupy the premises.

■ In docket No. 500–81L, FBIC claims the February 2, 1970, letter constitutes an existing lease and that that lease was breached. It is clear that the February 2, 1970, letter standing alone, does not constitute a present lease. As an executory instrument, or an agreement to enter a lease in the future, by its terms, no lease ever came into existence and BIA's obligations to occupy never ripened. Accordingly, FBIC's claim for breach of a lease agreement in docket No. 500–81L must fail.

### Counts II and III

Bank's claims in Counts II and III are based upon alleged breaches of fiduciary responsibilities owed by the United States by virtue of its trust relationship to FBIC. Any trust obligations of the United States are owed to FBIC, and Bank's rights, if any, stem from the assignments made by

Builders on July 8, 1970, and by FBIC in the loan agreement. The alleged breaches of fiduciary duties include BIA's approval of contracts made by FBIC and Builders and BIA's failure to investigate adequately and review FBIC's and Builders' activities under those contracts.

Defendant's motion for summary judgment rests on the decision of the Court of Claims in docket No. 500–81L that held that the FBIC had no money claim against the United States based on alleged breaches of fiduciary duties. Defendant asserts that the rights of Bank, as an alleged assignee, can rise no higher than those of FBIC, and that Counts II and III must be dismissed as a matter of law. In reply, Bank argues that the Supreme Court, in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II), restated the law applicable to standards for money claims based on breach of fiduciary duties owed by the United States. As a result of this subsequent clarification of the law, according to Bank, the Court of Claims decision in docket No. 500–81L no longer has validity.

To put this issue in perspective, it is helpful to examine the chronology of this litigation. The petition (now complaint) containing Bank's claims in Counts II and III was filed on June 9, 1977. Defendant moved for summary judgment, and the Court of Claims on October 16, 1978, remanded Counts II and III for further proceedings. The Court of Claims observed that these counts presented unique and factually complicated arguments involving several issues of first impression, and that defendant's answer admitted the existence of a trust relationship with the tribe. The court stated:

> This of course leaves open such questions as what the basis of the trust relationship is, what its obligations included, whether such duties are owed to Builders as well as to the tribe, whether defendant's obligations were breached, whether any claim arising out of such a breach can be brought by a non-Indian (to whom the duty does not run directly) upon an assignment of the claim, and whether any such claim was in fact assigned to plaintiff here.

Although some of these issues appeared to be purely legal, the court stated they would be remanded for further illumination of the factual background and of any factual defect in Bank's theory that may make it unnecessary to grapple with the novel legal questions.

After the Court of Claims decision, with the knowledge and consent of Bank, FBIC on August 14, 1981, filed docket No. 500–81L. In that complaint, Counts II and III raised identical allegations of breach of the fiduciary obligations that previously had been asserted by Bank. The complaint omitted the allegations of the assignment of the claims to Bank. On defendant's motion, the Court of Claims on August 6, 1982, dismissed Counts II and III because it agreed that FBIC had failed to state a claim within the jurisdiction of the court. This determination was based upon the Court of Claims construction of 25 U.S.C. § 81 (1976) (Section 81), the statute FBIC relied upon as the basis for United States fiduciary obligations. Section 81 requires the approval of the Secretary of the Interior and the Commissioner of Indian Affairs for any contract made by any person with any tribe of Indians, or with individual Indians. The Court of Claims held that Section 81 does not mandate the payment of money if the United States approves Indian contracts that prove to be unwise or improvident. The Court of Claims further held that Section 81 fell far short of imposing a fiduciary obligation upon the United States that would make the government liable for losses Indians may suffer as the result of their contracts with third parties that the government approved.

Bank contends that the August 6, 1982, Court of Claims decision in docket No. 500–81L is not controlling, and that, under the standards enunciated in *Mitchell II* on June 27, 1983, the United States now is accountable in money damages for alleged breaches of trust in connection with its duties under 25 U.S.C. § 81. In *Mitchell II*, the

Supreme Court clarified confusion that had arisen as to whether the Court of Claims' jurisdictional statute, the Tucker Act, now 28 U.S.C. § 1491(a)(1), constitutes a waiver of sovereign immunity, and the relationship of that waiver to the requirement that a substantive right for money damages must be found in some other source of law. After *Mitchell I,* and *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) some confusion arose as to whether a separate waiver of sovereign immunity must be shown as to the related substantive provision, and whether that substantive provision was required to be construed under the strict standards appropriate to waivers of sovereign immunity.

Bank contends that the Court of Claims, in its August 6, 1982, decision held that a separate substantive waiver of sovereign immunity must be found in Section 81, and that the independent waiver must evidence a "clear and strong" congressional intent to create a fiduciary duty in a statute that mandates compensation for its breach. Bank argues the decision is in error because the *Mitchell II* decision makes it clear that as to Section 81 a separate waiver of immunity is not needed, and rules of strict construction are not used.

Bank is correct as to the clarification made by *Mitchell II.* In summary, the Supreme Court described the content of 28 U.S.C. § 1491(a)(1) as follows:

> Thus, for claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department," 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained. In undertaking this inquiry, a court need not find a separate waiver of sovereign immunity in the substantive provision, just as a court need not find consent to suit in "any express or implied contract with the United States." Ibid. The Tucker Act itself provides the necessary consent. *Mitchell II,* 103 S.Ct. at 2968.

■ Where the statutes or regulations require compensation, consent to suit is supplied by the Tucker Act, and the separate statutes and regulations on which the claim is based need not provide a second waiver of sovereign immunity. It is not appropriate to construe such statutes or regulations in the manner appropriate to waivers of sovereign immunity. *Mitchell II,* 103 S.Ct. at 2969, *citing United States v. Aetna Casualty Surety Co.,* 338 U.S. 366, 383, 70 S.Ct. 207, 216, 94 L.Ed. 171 (1949); *United States v. Emery, Bird, Thayer Realty Co.,* 237 U.S. 28, 32, 35 S.Ct. 499, 500, 59 L.Ed. 825 (1915).

■ Bank is correct that under *Mitchell II* standards there is no need for showing of a separate waiver of sovereign immunity in Section 81. Nor is it appropriate to utilize the strict rules of construction and "read with an adverse eye" to determine whether Section 81 mandates compensation by the Federal Government for damage sustained through violation of its provisions. For there to be a complete trust relationship, however, there must be a clear or strong showing that Congress intended to create such fiduciary duties.

■ There is a general trust relationship that exists between the United States and the FBIC, as a recognized group of Indians. Defendant acknowledged that relationship in its answer. The relevant statute, 25 U.S.C. § 81, is to be construed in the light of the undisputed existence of this general trust relationship incumbent upon the United States in its dealings with "these dependent and sometimes exploited people." *Mitchell II,* 103 S.Ct. at 2972.

■ The existence of the general trust relationship, however, does not resolve the scope of the Government's obligations under Section 81. The general trust relationship in itself does not impose such duties as are erected in a complete trust with fully accountable fiduciary obligations. When the source of substantive law intended and recognized only the general, or bare, trust relationship, fiduciary obligations applica-

ble to private trustees are not imposed on the United States.

■ The source of substantive law in Bank's claims, Section 81, does not establish the comprehensive management role over Indian affairs that signifies a complete trust with full fiduciary accountability. As the Court of Claims observed, the statute was designed to protect Indians by subjecting their contracts with third persons to the prior examination and approval of the Secretary of the Interior and the Commissioner of Indian Affairs. *See* H.R. Rep. No. 2449, 85th Cong., 2d sess. 1, *reprinted in* 1958 U.S.Code Cong. & Ad. News 3961. The relationship created by Section 81 is not comparable in purpose or degree to the control or supervision of tribal monies or properties that has been found to establish a complete fiduciary relationship with a duty to account as a trustee. *Navajo Tribe of Indians v. United States,* 624 F.2d 981, 987 (Ct.Cl.1980). Nor is the system for approvals in Section 81 as comprehensive and detailed as the timber management statutes, and federal statutes governing road building and rights-of-way, and their supplemental regulations, that have been held to impose a fiduciary relationship on the United States. *Mitchell II,* 103 S.Ct. at 2972. Section 81 procedures are not sufficient to justify, as reasonable, the conclusion that Congress intended the United States to be liable monetarily and implicitly impose a fiduciary relationship.

■ Section 81 provides a mechanism for third parties to bring an action in the name of the United States to recover money paid in excess of the amount approved by the Commissioner and Secretary. Amounts so recovered are paid one half to the person suing and one half into the Treasury, for the use of the Indians involved. This ancillary enforcement procedure cannot be interpreted fairly as mandating compensation by the United States for damages sustained by the Indians, or as imposing a fiduciary obligation on the United States that would make it liable for losses the Indians may suffer as the result

of contracts with third parties that were approved.

Defendant in its motion for summary judgment challenges Bank's standing to pursue the claims in Counts II and III. As an assignee of FBIC, defendant argues, any rights Bank may have were extinguished when FBIC's identical claims were adjudicated and dismissed in docket No. 500–81L. Bank replies that, because the assignments occurred prior to the commencement of FBIC's action, it is not in privity with FBIC as to the claims in Counts II and III, and the dismissal in docket No. 500–81L is not binding upon it.

■ Although the law in this area is sparse, Bank is correct insofar as it argues that a judgment for or against an assignor is not conclusive as to an assignee, if the assignment occurred prior to the commencement of the action. 50 C.J.S. *Judgments* § 789 (1947). The assignee is not bound because the assignor had transferred his rights and no longer had authority to discharge the obligation. Restatement (Second) of Judgments § 55 (1982). An assignee who received his assignment prior to institution of the assignor's suit is not barred from relitigating certain issues, because he was not in privity to the prior judgment against his assignor. *Gramatan Home Investors v. Lopez,* 46 N.Y.2d 481, 414 N.Y.S.2d 308, 386 N.E.2d 1328 (NY 1979). The rationale for the rule is: no grantee is to be bound by a judgment in an action commenced against his grantor subsequent to the grant because the estate of the true owner would be defeated by a man having no interest in the property. *Dull v. Blackman,* 169 U.S. 243, 248, 18 S.Ct. 333, 335, 42 L.Ed. 733 (1898).

■ The rule that the prior assignee is not in privity, however, has no application if the assignee in fact had knowledge and consented to his assignor's later bringing of the action. In such a case, as the true owner, the assignee is in fact the principal, and the assignor is his agent when the claim is brought. *State Mut. Life Assur. Co. v. Deer Creek Park,* 612 F.2d 259 (6th Cir.1979).

It is clear that when FBIC filed the complaint in docket No. 500–81L on August 14, 1981, the action was taken with Bank's full knowledge and consent. In the circumstances, FBIC was, in fact, Bank's agent on the claims in Counts II and III of docket No. 500–81L. Accordingly, Bank stands in the same shoes as FBIC as to the August 6, 1982, decision of the Court of Claims.

## CONCLUSION

On the basis of the foregoing findings of fact and opinion, the United States has no liability for damages to Bank on Count I of docket No. 328–77, or to FBIC on Count I of docket No. 500–81L. Defendant is entitled to prevail on its motion for summary judgment as to Counts II and III of docket No. 328–77 and said motion is allowed. The clerk is directed to dismiss the complaint in docket No. 328–77 and the complaint in docket No. 500–81L.