**PUEBLO OF SANTA ANA, Pueblo of San Juan, Pueblo of Tesuque, Pueblo of Acoma, Pueblo of Sandia, Pueblo of Isleta, Pueblo of Pojoaque, San Felipe Gaming Enterprise Board, and Pueblo of Taos, Plaintiffs,**

v.

**John J. KELLY, in his official capacity as United States Attorney for the District of New Mexico; Janet Reno, Attorney General of the United States; Bruce Babbitt, United States Secretary of the Interior; and the United States of America, Defendants.**

**UNITED STATES of America, Counterclaimant,**

v.

**PUEBLO OF SANTA ANA, Pueblo of San Juan, Pueblo of Tesuque, Pueblo of Acoma, Pueblo of Sandia, Pueblo of Isleta, Pueblo of Pojoaque, San Felipe Gaming Enterprise Board, and Pueblo of Taos,**

and

State of New Mexico, Counterdefendants.

No. Civ. 96–0002 MV/WWD.

United States District Court, D. New Mexico.

July 12, 1996.

Leander Bergen, B. Reid Haltom, Nordhaus, Haltom, Taylor, Taradash & Frye, Albuquerque, NM, Daniel M. Rosenfelt, Rosenfelt, Barlow, Barber, Barudin & Borg, Albuquerque, NM, Richard W. Hughes, Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, Santa Fe, NM, for Pueblo of Santa Ana, San Juan Pueblo.

Kevin Gover, Gwenellen P. Janov, Gover, Stetson & Williams, Albuquerque, NM, Daniel M. Rosenfelt, Rosenfelt, Barlow, Barber, Barudin & Borg, Albuquerque, NM, for Pueblo of Tesuque.

Daniel M. Rosenfelt, Rosenfelt, Barlow, Barber, Barudin & Borg, Albuquerque, NM, Peter C. Chestnut, Chestnut Law Offices, Albuquerque, NM, for Pueblo of Acoma.

L. Lamar Parrish, Ussery & Parrish, Albuquerque, NM, Daniel M. Rosenfelt, Rosenfelt, Barlow, Barber, Barudin & Borg, Albuquerque, NM, for Pueblo of Sandia, Pueblo of Isleta.

Daniel M. Rosenfelt, Rosenfelt, Barlow, Barber, Barudin & Borg, Albuquerque, NM, Joseph D. Little, Santa Fe, NM, for Pueblo of Pojoaque.

Daniel M. Rosenfelt, Sarah W. Barlow, Richard A. Allen, Rosenfelt, Barlow, Barber, Barudin & Borg, Albuquerque, NM, for San Felipe Gaming Enterprise Board, Taos Pueblo.

Victor R. Marshall, Marshall & Associates, Albuquerque, NM, for Guy Clark, Max W. Coll, II, George Buffett.

Raymond Hamilton, Phyllis A. Dow, U.S. Attorney's Office, District of New Mexico, Albuquerque, NM, Lois J. Schiffer, Edward J. Passarelli, U.S. Department of Justice, Environmental & Natural Resources Div., Washington, DC, for John J. Kelly, Janet Reno, Bruce Babbitt, United States of America.

Harold D. Stratton, Jr., Stephen D. Ingram, Stratton & Cavin, Albuquerque, NM, for Sodak Gaming, Inc., amicus curiae.

John Burton, Rodey, Dickason, Sloan, Akin & Robb, Santa Fe, NM, for Bally Gaming, Inc., amicus curiae.

John C. Bienvenu, Santa Fe, NM, Kurt V. BlueDog, Andrew M. Small, BlueDog, Olson & Small, Minneapolis, MN, Jerome L. Levine, Frank R. Lawrence, Levine & Associates, Los Angeles, CA, for National Indian Gaming Association, San Manuel Band of Mission Indians, Shakopee Mdewakanton Sioux Community, Sisseton Wahpeton Sioux Tribe, amici curiae.

Christopher D. Coppin, NM Attorney General's Office, Albuquerque, NM, for State of New Mexico.

## OPINION

VAZQUEZ, District Judge.

THIS MATTER came before the Court on Plaintiffs' Motion for Summary Judgment as to all of Plaintiffs' Claims and as to Defendants' First and Third Counterclaims, filed April 15, 1996 [Doc. No. 97], Plaintiffs' Supplemental Motion for Summary Judgment with Respect to Defendants' Second Counterclaim, filed April 15, 1996 [Doc. No. 101] and Defendants' Cross Motion for Summary Judgment, filed May 13, 1996 [Doc. No. 133]. A hearing was held on June 18, 1996, and the Court took the motions under advisement. The Court, having considered all briefs, oral arguments of counsel, and being otherwise fully advised, finds that Defendants' Cross Motion for Summary Judgment is well-taken and will be granted and Plaintiffs' Motion for Summary Judgment and Supplemental Motion for Summary Judgment will be denied.

## STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in light most favorable to the non-moving party, determines that there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law. *Thrasher v. B & B Chemical Co., Inc.,* 2 F.3d 995, 996 (10th Cir.1993). The movant

bears the initial burden of showing there is an absence of evidence to support the non-moving party's case. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■■■ "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (emphasis added). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citation omitted); *Carland v. Metropolitan Life Insurance Co.,* 935 F.2d 1114, 1118 (10th Cir.), *cert. denied,* 502 U.S. 1020, 112 S.Ct. 670, 116 L.Ed.2d 761 (1991).

## HISTORY OF THE INDIAN GAMING REGULATORY ACT

■ A brief overview of the principles of Indian sovereignty is important to understanding the history and evolution of the law on Indian gaming. "Indian tribes retain 'attributes of sovereignty over both their members and their territory,' *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975), and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,' *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134,

154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980)." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987). State law may be applied to tribal Indians on their reservations, however, if Congress has expressly consented or under certain other limited circumstances when it does not interfere with or is not "incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *Id.* at 207 & 215–17, 107 S.Ct. at 1087 & 1091–92.

Consistent with these established principles, the Supreme Court, in *Cabazon,* ruled that neither the State of California nor the County of Riverside had any authority to enforce its gambling laws within Indian reservations. *Id.* at 207, 107 S.Ct. at 1087. The Cabazon and Morongo Tribes were conducting bingo and card games which were open to the public. *Id.* at 204–05, 107 S.Ct. at 1085–86. Each Tribe was acting pursuant to tribal ordinances approved by the Secretary of the Interior. *Id.* Thereafter, the State began to insist that the two Tribes comply with a State statute that did not prohibit the playing of bingo but imposed staffing, jackpot limit and separate fund requirements. *Id.* at 205 & 206 n. 3, 107 S.Ct. at 1086 n. 3. The violation of any of these requirements constitutes a misdemeanor. *Id.* at 209, 107 S.Ct. at 1088. The County of Riverside also sought to apply two local ordinances, one regulating *bingo* and the other prohibiting the playing of card games. *Id.* at 205–06, 107 S.Ct. at 1086–87.

The Tribes filed an action against the county seeking a declaratory judgment that the county did not have authority to apply its ordinances within the reservations and an injunction against their enforcement. *Id.* The State subsequently intervened, insisting that Congress had given the State express consent to apply its laws to Indians on their reservations pursuant to Pub.L. 280, 67 Stat. 588, as amended, 18 U.S.C. § 1162, 28 U.S.C. § 1360 and the Organized Crime Control Act, 84 Stat. 937, 18 U.S.C. § 1955. *Id.* The district court held that neither the State nor the county had authority to enforce its gam-

bling law on reservations and the Ninth Circuit affirmed. *Id.* The State appealed to the United States Supreme Court.

The Supreme Court determined that Congress had not expressly consented to California's application of its gambling laws within the reservation and then went on to consider whether exceptional circumstances nonetheless warranted the State's assertion of jurisdiction over the activities of Indians within the reservation. *Id.* at 214–22, 107 S.Ct. at 1090–95. This inquiry proceeds "in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *Id.* at 216, 107 S.Ct. at 1092 (citations omitted). The Court acknowledged that the federal government sought to implement these important federal interests by approving of and promoting the gaming activities being conducted by the two tribes. *Id.* at 217, 107 S.Ct. at 1092–93. The Court noted that

> [t]hese policies and actions, which demonstrate the Government's approval and active promotion of tribal bingo enterprises, are of particular relevance in this case. The Cabazon and Morongo Reservations contain no natural resources which can be exploited. The tribal games at present provide the sole source of revenues for the operation of the tribal governments and the provision of tribal services. They are also the major source of employment on the reservations. Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members.

*Id.* at 218–19, 107 S.Ct. at 1093. The Court recognized that while the State's interest in preventing the Indian gaming activities from being infiltrated by organized crime was a legitimate concern, it was not "sufficient to escape the pre-emptive force of federal and tribal interests in gaming." *Id.* at 221, 107 S.Ct. at 1093. Thus, the Court concluded that State and county regulation of Indian gaming was impermissible. *Id.* at 221–22, 107 S.Ct. at 1094–95.

In 1988, in the wake of *Cabazon,* Congress enacted the Indian Gaming Regulatory Act ("IGRA" or "the Act"), 25 U.S.C. §§ 2701–2721, to balance the states' interest in regulating high stakes gambling within their borders and the Indians' resistance to state intrusions on their sovereignty. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin,* 770 F.Supp. 480, 481 (W.D.Wis.1991), *appeal dismissed* 957 F.2d 515 (7th Cir.), *cert. denied, Wisconsin v. Lac du Flambeau Band of Lake Superior Chippewa Indians,* 506 U.S. 829, 113 S.Ct. 91, 121 L.Ed.2d 53 (1992); S.Rep. No. 100–446, 100th Cong., 2d Sess. at 13. The Act established a statutory framework for the growing Indian gaming industry which "expressly pre-empt[s] the field of governance of gaming activities on Indian lands." S.Rep. No. 100–446 at 6, 100th Cong., 2nd Sess., 1988 U.S.Code Cong. & Admin.News 3071, 3076. If the Act's requirements are satisfied, Indian gaming activities are exempt from federal criminal gambling prohibitions. *See* 15 U.S.C. §§ 1171–1178 (Johnson Act); 18 U.S.C. § 1166 (Gambling in Indian Country); 18 U.S.C. § 1955 (Organized Crime Control Act).

The Act classifies all Indian gaming activities as Class I, II, or III. Each class has a different regulatory scheme. Class I gaming includes social games played for prizes of minimal value and other traditional Indian games engaged in as a part of tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive jurisdiction of the Indian tribe and is not subject to the provisions of the Act. 25 U.S.C. § 2710(a)(1). Class II gaming includes bingo, certain non-banking card games not prohibited by state law, pull-tabs, lotto, punch boards and other games similar to bingo if played in the same location as bingo. 25 U.S.C. § 2703(7)(A). Class II games are allowed on tribal lands if: (1) such lands are located in a state which permits such gaming for any purpose by any person and (2) the gaming is conducted pursuant to a properly adopted and approved tribal ordinance. 25 U.S.C. § 2710(b). Class III gaming consists of all gaming that is not Class I or Class II gaming. 25 U.S.C. Section 2703(8). Generally, Class III gaming, includes but is not limited to the following:

banking card games; casino games such as roulette, craps and keno; any slot machines and electronic or electromechanical facsimiles of any game of chance; pari-mutuel wager on horse racing, dog racing, or jai alai; and lotteries. 25 C.F.R. § 502.4. The requirements for Class III gaming are essentially identical to those for Class II gaming but the Act imposes an additional requirement that Class III gaming be conducted in conformance with a tribal-state compact entered into by the Indian tribe and the State that is in effect. 25 U.S.C. § 2710(d)(1). Only Class III gaming is at issue in this case.

## FACTUAL BACKGROUND

The undisputed facts for purposes of the cross-motions before the Court are as follows: Plaintiffs Pueblo of Santa Ana, Pueblo of San Juan, Pueblo of Tesuque, Pueblo of Acoma, Pueblo of Sandia, Pueblo of Isleta, Pueblo of Pojoaque, and Pueblo of Taos are federally recognized Indian tribes. Plaintiff San Felipe Gaming Enterprise Board is a gaming enterprise charged under the laws of the Pueblo of San Felipe. (Plaintiffs are collectively referred to as the "Tribes"). Beginning as early as 1986, Plaintiff Sandia Pueblo began offering Class III gaming on its reservation. After the IGRA was enacted in 1988, but before Plaintiff Tribes executed compacts with Governor Johnson in 1995, the remaining Plaintiff Tribes, except Taos and San Felipe, began to conduct some form Class III gaming activity on their reservations. In 1994, the gaming Tribes who were conducting some form of Class III gaming without compacts entered into non-prosecution agreements with the United States Attorney whereby the Tribes agreed not to expand their gaming activities beyond specified levels in exchange for the United States Attorney's agreement not to take any enforcement action against them for failing to comply with the provisions of the IGRA.

In November 1994, New Mexico Governor Gary Johnson's administration began negotiating compacts with the Plaintiff Tribes. Between February 13, 1995 and March 1, 1995. Governor Johnson and a representative from each Tribe signed the compacts. There is no evidence that compacts were ever submitted to the legislature for approval. On March 15, 1995, the Secretary of the Interior ("Secretary") approved the compacts executed by the Pueblos of Santa Ana, San Juan, Taos, Pojoaque, Sandia, Tesuque, Isleta, and San Felipe and notice of the Secretary's approval was published in the Federal Register on March 22, 1995. The Secretary approved the tribal-state compact signed by Acoma Pueblo on April 24, 1995. Notice of the Secretary's approval of this compact was published in the Federal Register on May 15, 1995.

The United States Attorney advised the Tribes on March 21, 1995 that he was terminating their non-prosecution agreements, indicating that the execution, approval and publication of Tribes' compacts should bring them into compliance with applicable federal law. In response to concerns raised by State House Speaker Raymond Sanchez that Governor Johnson did not have the authority to sign the compacts on behalf of the State. Secretary Babbitt stated, in an April 5, 1995 letter to United States Senator Jeff Bingaman, that notwithstanding his approval, "[w]e agree that compacts between Indian tribes and states are valid only if entered into by the appropriate state officials."

This action was prompted by two New Mexico Supreme Court opinions which address the legalities of Indian gaming in New Mexico. On July 13, 1995, the New Mexico Supreme Court ruled that Governor Johnson lacked the authority to sign the compacts on behalf of the State, and that "no gaming compacts exist between the Tribes and Pueblos and the State of New Mexico." *State ex rel. Clark v. Johnson*, 120 N.M. 562, 578, 904 P.2d 11, 27 (1995). On November 29, 1995, the New Mexico Supreme Court issued another opinion indicating that New Mexico law does not authorize any form of "casino-style gambling" and thus the Tribes have not satisfied the requirement that Class III gaming activities be located in a state which permits such gaming for any purpose by any person. *Citation Bingo, Ltd. v. Otten*, 121 N.M. 205, 207–08, 910 P.2d 281, 283–84 n. 2 (1995).

Based on *Clark* and *Citation Bingo*, the United States Attorney took the position that the Tribes' Class III gaming activities are in

violation of federal law. The United States Attorney warned the Tribes that their gaming activities must cease or casino employees and patrons will be subject to federal criminal sanctions and the alleged illegal gaming devices will be subject to forfeiture. The Tribes assert through this action that their compacts with the State are valid and in effect pursuant to federal law and that the scope of gaming they offer was permitted by any person for any person in New Mexico at the time the compacts were signed which was prior to the State Supreme Court's decisions in *Clark* and *Citation Bingo*. The Tribes seek a declaration of their right to continue conducting gaming activities on their reservations. The United States filed a counterclaim asserting that the Tribes' gaming activities fail to satisfy the requirements of IGRA and are therefore unlawful. The United States also joined the State of New Mexico as a party.

## DISCUSSION

Class III gaming is lawful on tribal reservations only if such activities are:

(A) authorized by an ordinance or resolution that—

(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

(ii) meets the requirements of subsection (b) of this section, and

(iii) is approved by the Chairman,

(B) located in a State that permits such gaming for any purpose by any person, organization or entity, and

(C) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State ... that is in effect.

25 U.S.C. § 2710(d)(1). With regard to the third requirement, the Tribes assert that the Secretary's approval of the compacts is conclusive as to their validity notwithstanding the New Mexico Supreme Court's ruling that the compacts are invalid under State law. Although it does not contest that the compacts are "in effect" for IGRA purposes, the United States asserts that the Court need not reach this issue. Instead, the United States urges the Court to decide the issue

based on the Tribes failure to satisfy Section 2710(d)(1)(B) of the IGRA which requires that a tribe's Class III gaming activities be located in a state that permits such gaming for any purpose by any person, organization or entity. The State of New Mexico, on the other hand, asserts that notwithstanding the Secretary's approval, the compacts are invalid because Governor Johnson did not have the authority to sign the compacts on behalf of the State.

■ The Court begins its analysis by determining whether the Tribes have satisfied Section 2710(d)(1)(C) of the IGRA, that is, whether there is a tribal-state compact that is in effect because this issue is dispositive of the controversy before the Court. To resolve this issue, the Court must undertake the task of prescribing a reasonable meaning to this provision of the Act. In doing so, the Court starts with a few established maxims of statutory construction.

> Statutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, *see e.g., Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986), or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988); *Massachusetts v. Morash*, 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) (in interpreting statutory language, a court looks to provisions of the whole law and to its object and policy); *Aulston v. United States*, 915 F.2d 584, 589 (10th Cir.1990) (same), *cert. denied*, 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991); *Bridger Coal Co./Pacific Minerals, Inc. v. Director, O.W.C.P.*, 927 F.2d 1150, 1153 (10th Cir.1991) (statute must not be construed in a way which renders words or phrases meaningless or superfluous).

■ With these principles in mind, an examination of various provisions of the IGRA

which relate to the requirements of Class III gaming leads to the conclusion that a valid compact is a prerequisite to the Secretarial approval necessary to put the compact "in effect". First, Section 2710(d)(3)(C) of the Act explains that the criminal prohibitions against gaming contained in the Johnson Act "shall not apply to any gaming conducted under a Tribal–State compact that—(A) is entered into ... by a State in which gambling devices are legal, and (B) is in effect." (emphasis added). In this Section, the compact requirement is separated from the requirement that the compact be approved by the Secretary by the conjunctive term "and", indicating that Congress recognized as distinct the existence of a valid tribal-state compact and the approval of the Secretary putting that compact into effect. *United States v. O'Driscoll,* 761 F.2d 589, 597–98 (10th Cir.1985) (conjunctive terms indicate that all requirements must be satisfied), *cert. denied, O'Driscoll v. United States,* 475 U.S. 1020, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986); Norman J. Singer, Statutes and Statutory Construction, Vol. 1A, § 21.14 (same). Second, Section 2710(d)(3)(B) of the Act, which addresses compact negotiations, states: "Any State and any Indian tribe may enter into a Tribal–State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." (emphasis added). The context of this provision further implies that the IGRA requires the existence of a valid Tribal–State compact independent of the requirement that the compact be in effect by virtue of the Secretary's approval.

The foregoing reading of Section 2710(d)(1)(C) is reinforced by the purposes of the Act. The articulated legislative purposes of the IGRA is:

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702. The differences between the requirements for Class II gaming and Class III gaming demonstrate that the central purpose of the Act's Class III gaming provisions is to protect against the infiltration of organized crime into high-stakes gaming. Class II games are allowed on tribal lands if: (1) such lands are located in a state which permits such gaming for any purpose by any person and (2) the gaming is conducted pursuant to a properly adopted and approved tribal ordinance. The requirements for Class III gaming are essentially identical to those for Class II gaming, but the Act imposes an additional requirement for Class III gaming which dictates that such gaming be conducted in conformance with a tribal-state compact entered into by the Indian tribe and the State that is in effect. *Compare* 25 U.S.C. § 2710(b) and 25 U.S.C. § 2710(d). The additional requirement shows that Congress was more concerned with negative consequences associated with high-stakes Class III gaming and thus allowed states to have more involvement in such gaming activities in order to protect tribes and other state residents. In large part, the state provides this protection in the form of regulatory oversight. *See e.g.,* 25 U.S.C. § 2710(d)(3)(C) & (5) (indicating the various regulatory provisions subject to negotiation). The State is given the opportunity to negotiate for a significant regulatory role over Class III gaming through "the tribal-state compact process, the means Congress devised to balance the states' interest in regulating high stakes gambling within

their borders and the Indians' resistance to state intrusions on their sovereignty." *Lac du Flambeau,* 770 F.Supp. at 481; S.Rep. No. 100–446, 100th Cong., 2d Sess. at 13. To find that Secretarial approval somehow overrides the compact requirement would frustrate an important purpose of the Act. See S.Rep. No. 100–446 at 6, 100th Cong., 2nd Sess., 1988 U.S.Code Cong. & Admin.News 3071, 3076 (IGRA "does not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absence of a tribal-State compact.").

Further, the mediation provision of the Act demonstrates just how important Congress thought it was to grant states a meaningful role over tribal gaming within its borders. 25 U.S.C. § 2710(d)(7)(B). Only after rejecting several opportunities to involve itself in the negotiation process does the Act terminate the State's opportunity to participate. In this situation, the Secretary, in consultation with the tribes, will prescribe procedures under which Class III gaming may be conducted on tribal lands. This lends support to the Court's conclusion that Congress did not intend that the Secretary's approval override deficiencies in the compact under state law. Although the continuing validity of the mediation provision is in question as a result of the Supreme Court's opinion in *Seminole Tribe of Florida v. Florida,* — U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), it is still a good measure of Congressional intent. — U.S. ——, ——, 116 S.Ct. 1114, 1133, 134 L.Ed.2d 252. The federal government, having plenary power over Indian affairs, could have enacted legislation permitting Indian tribes to conduct all forms of gaming on their reservations without any input from states. Instead, however, Congress gave states a significant role in the scheme. The Court's interpretation of the language and policy of Section 2710(d)(1)(C) avoids rendering the required compact process meaningless.

Two Federal District Courts have concluded that

nothing in the IGRA even suggests that Congress intended that the Secretary determine who is authorized to execute compacts on behalf of states. Furthermore,

such a intent should not be imputed to Congress, because it is patently unreasonable to expect that potentially complex questions of that nature can be adequately addressed during the 45 day review mandated by the IGRA.

*State of Rhode Island v. The Narragansett Indian Tribe,* No. 94–0619–T, slip op. at 4, 1996 WL 97856 (D.R.I. Jan. 21, 1995); *The Apache Tribe of the Mescalero Reservation v. State of New Mexico,* Civ. No. 92–0076 JC/WWD, slip op. at 13, 1992 WL 685374 (D.N.M. June 6, 1996) (quoting *Narragansett* with approval). This view is supported by the letter drafted by the Secretary shortly after he approved Acoma Pueblo's gaming compact, stating that he "agree[s] that compacts between Indian tribes and states are valid only if entered into by the appropriate State official." Letter From Secretary of the Interior Bruce Babbitt to New Mexico Senator Jeff Bingaman of April 5, 1995. Although the Act's language and purpose indicate that a valid compact is required, the court is unconvinced that such a ruling should be based on the argument that it is unreasonable to expect the Secretary to delve into complex issues of State law. The purpose of the 45–day review period is merely a deadline necessary to ensure that the Secretary does not delay approval of a compact when both a tribe and a state urge its approval.

This Court's ruling in no way implies that the Secretary's approval of the compacts constitutes an abuse of discretion. The Court only finds that his approval is a separate requirement which puts a valid compact into operation. The Secretary's approval cannot in itself validate an otherwise invalid compact. In ruling that the Secretary cannot validate an invalid compact merely by giving it his stamp of approval, the Court need not reach the question of whether the Secretary properly approved the compacts in this case.

■ The validity of the Plaintiff Tribes' gaming compacts presents a federal question to be decided by this Court. *See State ex rel. Dyer v. Sims,* 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951). This issue cannot be unilaterally decided by the State, however, as the State is purportedly a party to the

compact. *Id.* ("It requires no elaborate argument to reject the suggestion that an agreement solemnly entered into between States by those who alone have political authority to speak for a State can be unilaterally nullified, or given final meaning by an organ of one of the contracting States."). In *Dyer v. Sims,* for example, West Virginia's legislature approved a water sanitation compact along with seven other states. Subsequently, the West Virginia Supreme Court of Appeals held that the legislative act of approving the compact was invalid pursuant to the State's constitution. The United States Supreme Court ruled that it had the final authority to determine the validity of the State's actions, and that the State court's opinion was not conclusive. Nonetheless, the Supreme Court indicated that "every deference will be shown to what the highest court of a state deems to be the law and policy of its State, particularly when recondite or unique features of local law are urged." 341 U.S. at 28, 71 S.Ct. at 560. The Supreme Court then proceeded to examine state law to determine if there was a violation of the state constitution. Interstate compact cases such as *Dyer* are analogous to the extent they hold that disputes arising under compacts present a question of federal law because here New Mexico is purportedly a party to agreements with other sovereigns just as in the compact cases a state is a party to an agreement with another state. *See Kickapoo Tribe v. Babbitt,* 827 F.Supp. 37, 44 (D.D.C. 1993) (concluding that validity of a gaming compact is a federal question), *rev'd on other grounds,* 43 F.3d 1491 (D.C.Cir.1995). Accordingly, this Court will examine the validity of the Tribes' gaming compacts.

 On July 13, 1995, shortly after the Secretary approved the compacts, the New Mexico Supreme Court ruled that the compacts were invalid because the Governor did not have the authority pursuant to the constitutional separation of powers doctrine to bind the State to such agreements. *State ex rel. Clark v. Johnson* 120 N.M. 562, 904 P.2d 11 (1995). For several reasons, the State court ruled that the Governor's actions unduly encroached on the Legislature's authority. For example, the State court reasoned that the compacts attempt to create new law and that

this is a legislative function. The State court further concluded that the compacts potentially foreclose the Legislature from ever enacting legislation which would adversely impact Indian gaming in New Mexico. 120 N.M. at 574, 904 P.2d at 23. Consequently, the State court held that it was the Legislature's function to enter into compacts on behalf of the State. The Legislature would have had to approve or ratify the Tribes' gaming compacts for them to be deemed valid. 120 N.M. at 575, 904 P.2d at 24. The State court went on to analyze two State statutes, the Joint Powers Agreement Act and the Mutual Aid Act, to determine if they delegated to the Governor the authority to sign the gaming compacts on behalf of the State but found that they did not confer any such authority upon the Governor. Finally, the State court found that "Congress, in enacting the IGRA, [did not seek] to invest state governors with powers in excess of those that the governors possess under state law." 120 N.M. at 577, 904 P.2d at 26.

The Tribes assert that, contrary to *Clark,* the Governor had the authority under the IGRA to sign the compacts on behalf of the State. It is true that nothing in the IGRA that specifies which state official(s) may sign a gaming compact on behalf of the state. However, precisely because the IGRA is silent on this issue, this Court concludes that Congress intended that state law determine the procedure for executing valid gaming compacts. *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (concluding that state law determines appropriate procedure to be followed by state to assert jurisdiction over acts committed by Indians on the reservation when the federal statute is silent). Accordingly, this Court reexamined New Mexico law independent of the *Clark* case to determine, as a matter of federal law, whether Governor Johnson had authority to sign the compacts on behalf of the State. Having thoroughly examined applicable New Mexico law, this Court reaches the same conclusion as did the State court in *Clark,* namely that Governor Johnson's actions encroached upon

the Legislature's authority, contrary to the constitutional separation of powers doctrine.

This Court is unpersuaded by the Tribes' contention that because the State would have no authority over Indian gaming absent the IGRA, consenting to a gaming compact pursuant to the Act involves no compromise of a state's own legislative function. On this basis, the Tribes assert that the Governor did not unduly intrude upon the Legislature's law-making function as asserted in *Clark.* It is immaterial, however, that the State would have no authority over Indian gaming absent the IGRA. Because the State was granted some authority over Indian gaming, that authority must be exercised by the appropriate governmental official(s). *Compare Willis v. Fordice,* 850 F.Supp. 523 (S.D.Miss.1994) (holding that governor had authority to execute compact on behalf of State pursuant to state statute that provides that the governor shall transact all the business of the state with any other state or territory). For these reasons, the Court holds that Governor Johnson lacked the authority to enter into compacts with the Tribes and thus the compacts are invalid as a matter of federal law.

 Notwithstanding any *ultra vires* action by the Governor, the Tribes still maintain that the compacts are valid as a matter of federal law. The Tribes rely on several cases involving state retrocession of jurisdiction over acts committed by Indians on reservations to the United States for the proposition that the Secretary's approval of the compacts conclusively establishes their validity. *See e.g., United States v. Lawrence,* 595 F.2d 1149 (9th Cir.), *cert. denied, Lawrence v. United States,* 444 U.S. 853, 100 S.Ct. 108, 62 L.Ed.2d 70 (1979); *United States v. Brown,* 334 F.Supp. 536 (D.Neb.1971); *Omaha Tribe of Nebraska v. Village of Walthill,* 334 F.Supp. 823 (D.Neb.1971), *aff'd* 460 F.2d 1327 (8th Cir.1972), *cert. denied,* 409 U.S. 1107, 93 S.Ct. 898, 34 L.Ed.2d 687 (1973); *see also Leser v. Garnett,* 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922) (holding that, State's ratification of proposed constitutional amendment became valid upon Secretary's certification despite legislature's lack of authority to ratify amendment). The retrocession cases developed as follows: In 1953, Congress en-

acted legislation transferring all jurisdiction, civil and criminal, over the Indian country within certain states. *Lawrence,* 595 F.2d at 1150. Other states were given the option of assuming jurisdiction over acts committed on reservations. *Id.*

> The action of Congress in placing jurisdiction over Indians in the hands of states had as its purpose the elimination of legal impediments standing in the way of the Indian becoming a first class citizen. Congress apparently assumed that subjecting the Indian to equality of the responsibilities of state law would make him equal in all respects to other citizens of the state.
>
> In 1968, the Congress authorized the United States to take back, via retrocession from [states] "all or any measure" of the jurisdiction transferred to the state [previously].

*Brown,* 334 F.Supp. at 537–38; *see also* 25 U.S.C. § 1323. The above cited retrocession cases hold that when the Secretary accepts a facially valid retrocession by a State, subsequent state law challenges to the validity of the State action have no effect on the validity of the retrocession for federal law purposes. The courts reason that it would be difficult for federal officials to delve into issues of state law and thus "[s]omewhere along the line, if only for the purpose of finality," federal officials must be able to rely on a facially valid act of the state. *Brown,* 334 F.Supp. at 540; *see also Lawrence,* 595 F.2d at 1151; *Walthill,* 334 F.Supp. at 829–33. The courts also note that the federal government had spent large sums of money and manpower in reassuming jurisdiction over the reservations in reliance on the state's action. *Brown,* 334 F.Supp. at 540; *Walthill,* 334 F.Supp. at 827.

This line of reasoning has been adopted in the context of Indian gaming. *Langley v. Edwards,* 872 F.Supp. 1531 (W.D.La.1995), *aff'd mem.,* 77 F.3d 479 (5th Cir.1996). The action in *Langley* was brought by dissident tribal members challenging the validity of their tribe's gaming compact, in part, because the governor could not, without legislative approval, bind the state to the provisions of a gaming compact. The court noted that the "IGRA expresses a congressional policy of putting compacts into force quickly, by

requiring the Secretary to approve or reject them within forty-five days of their submission." *Id.* at 1535 (citation omitted). With that policy consideration in mind, the court held that a compact

> cannot be invalidated on the basis of the governor's *ultra vires* action, because a contrary rule would compel the Secretary to consider state law before approving any compact. That, the court stated would lead to endless delay. Since that result is contrary to the congressional intent expressed in the IGRA, it must be avoided by independent state law challenges. ·

*Id.* at 1535 (citations and internal quotations omitted). At first blush, *Langley*'s reliance on the retrocession cases appears compelling. However, after a careful comparison of the language and purpose of the two statutory schemes, the Court finds *Langley*'s reliance on the retrocession cases unpersuasive.

On the one hand, the retrocession statute merely states: "The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction. . . ." 25 U.S.C. § 1323. State retrocession is a one-time event between the state and the United States. "The federal government, having plenary power over the Indians, had the power to prescribe any method or event it desired to trigger its own reassumption of control over Indian affairs within a state. In fact, the triggering event could have been devoid of any mention of state action at all." *Brown,* 334 F.Supp. at 540. Further, the policy and intent of this statute strongly favors federal jurisdiction. *Omaha Tribe of Nebraska v. Village of Walthill,* 334 F.Supp. at 834. Construing the statute to permit the United States to accept an invalid state retrocession for purposes of finality does not compromise the intent of the statute which is to permit the United States to regain jurisdiction over civil and criminal causes of action involving Indians on their reservations.

On the other hand, a gaming compact is an ongoing agreement which, unlike a retrocession, imposes affirmative duties upon the state. The Court questions whether the United States has the power to require a state to affirmatively regulate gaming pursuant to an agreement never consented to by the state. The retrocession cases are also distinguishable because the underlying policy goal of finality is not as important in the context of gaming. Acknowledging that some states were profoundly concerned about the negative spill-over effects gaming might have on them and their citizens, the Act granted the states a more specific and vital role than that given states pursuant to the retrocession statute. *See* 25 U.S.C. § 2702(2) (stating that one of the purposes of the Act is to shield the tribes from organized crime and other corrupting influences); S.Rep. No. 100–446 at 2, 100th Cong., 2nd Sess., 1988 U.S.Code Cong. & Admin.News 3071 and 3075 (gaming legislation intended to protect the tribes and state from unscrupulous persons and to balance their competing economic interests). IGRA's provisions reveal that Congress took great pains to provide states a meaningful opportunity to become intimately involved in the regulation of gaming in order to protect themselves and the tribes from gaming's possible negative effects. IGRA's mediation provision, for example, demonstrates just how important Congress felt it was to give states the opportunity to negotiate a significant regulatory role over Class III gaming in order to protect against the possible negative consequences associated with such gaming. 25 U.S.C. § 2710(d)(7)(B). Only after rejecting several opportunities to involve itself in the negotiation and mediation process does the Act terminate the State's opportunity to assert a role over Indian gaming. This lends support to the Court's conclusion that Congress did not intend that the Secretary's approval override deficiencies in. the compact under state law. As stated earlier, notwithstanding its questionable validity in light of *Seminole,* the mediation provision is still a good measure of Congressional intent. Thus, to achieve Congress' policy goal, the Court must construe the IGRA as requiring a valid tribal-state compact. To hold otherwise would forever strip away the State's ability to protect itself and the Tribes from the negative effects of gaming, contrary to the Act's purpose. The policy argument of finality must, therefore, give way to the overarching concern of the IGRA which is to

protect states and tribes from negative effects associated with gaming, especially when such problems potentially cross reservation borders. The opinion in *Langley* does not address the implications of allowing a state official's *ultra vires* action to compromise the State's ability to protect itself and the Tribes from the infiltration of organized crime and other negative effects.

In sum, the Court has ruled that the Tribal–State compacts are invalid and thus the Tribes have failed to satisfy a requirement necessary for them to conduct Class III gaming. It is therefore unnecessary to determine whether the Tribes' gaming is being conducted pursuant to a duly adopted tribal ordinance or whether New Mexico allows such gaming for any purpose by any person. That said, the Court feels compelled to express its concern that today's ruling taken together with the Supreme Court's recent decision in *Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) confers substantially more power upon the State than Congress intended. The Supreme Court in *Seminole* held that the Eleventh Amendment prevents Congress from authorizing suits by Indian tribes against States to enforce the provisions of the IGRA. Today's ruling could result in New Mexico's refusal to negotiate new compacts with the Tribes. In such a situation, the Tribes would be without recourse in light of *Seminole*, as they could not bring suit against the State for refusing to negotiate.

As the Court stated earlier, Congress intended that the Act balance the States' and Tribes' interests through the compact negotiation process. Contrary to Congress' intent, today's ruling combined with the Supreme Court's decision in *Seminole* has essentially given the State veto power over Indian gaming in New Mexico. The Court does not have the authority, however, to rewrite the Act "in order to approximate what we think Congress might have wanted had it known" the effect today's ruling would have on the Plaintiff Tribes in light of *Seminole*. *Id.* at 1133. "If that effort is to be made, it should be made by Congress, and not by the federal courts." *Id.*

## ALTERNATIVE CLAIMS ASSERTED BY THE TRIBES

The Tribes assert various alternative theories for relief. The Tribes' claims asserted pursuant to the Contracts Clause and Takings Clause must fail. The Contracts Clause does not apply to the federal government. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 n. 9, 104 S.Ct. 2709, 2719 n. 9, 81 L.Ed.2d 601 (1984). Nonetheless, the Fifth Amendment's Due Process Clause does prohibit the United States from impairing contractual obligations except in the exercise of its police power. *National Railroad Passenger Corp. v. Atchison, Topeka and Santa Fe Railway Co.*, 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). The Court need not discuss this claim further as no valid Tribal–State compact exists. The Tribes' claim pursuant to the Takings Clause is similarly without merit because the Tribes did not previously have the right to offer Class III gaming on their reservations. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992) (holding that, to assert a viable claim pursuant to the Fifth Amendment's Takings Clause, Plaintiff must have a cognizable property right).

The Tribes also assert a breach of trust claim on the basis that the United States has a trust responsibility to protect the Tribes' rights under the gaming compacts. A limited trust relationship does exist between the United States and Indian tribes. *United States v. Mitchell*, 445 U.S. 535, 542, 100 S.Ct. 1349, 1353–54 (1979) ("Mitchell I") (indicating that only a limited trust relationship exists unless statute unambiguously imposes a duty on the government to act); *Vizenor v. Babbitt*, 927 F.Supp. 1193, 1199–1203 (D.Minn.1996); *Montana Bank of Circle v. United States*, 7 Cl.Ct. 601, 613 (1985). This limited trust relationship does not in itself, however, impose duties upon the United States such as those applicable to private trustees. *Montana* at 613–614. To impose such obligations, the substantive law at issue must unambiguously impose upon the United States detailed, comprehensive duties over Indian affairs. *Id.* at 614; *United States v.*

*Mitchell,* 463 U.S. 206, 221, 103 S.Ct. 2961, 2970, 77 L.Ed.2d 580 (1983) ("Mitchell II") (Congress specifically directed Interior Department on method of managing Indian forest resources); *Pawnee v. United States,* 830 F.2d 187 (Fed.Cir.1987) (statute establishes fiduciary obligations as it grants the Secretary of the Interior authority to determine whether to consent to lease of Indian mineral lands, the terms of the lease, enact regulations necessary to carry out legislation), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). In this case, the IGRA requires the Secretary to review and approve the gaming compacts. The Act does not unambiguously impose upon the United States the duty to ensure that Indian gaming continue under any circumstances. *See Mitchell I,* 445 U.S. at 541–42, 100 S.Ct. at 1353 (ruling that Act which provides that United States shall hold allotted land "in trust for the sole use and benefit" of the allottees only creates a limited trust relationship.). The Secretary has no detailed, comprehensive control over the daily management of the casino or the money earned by such operations. Moreover, the Tribes have presented no evidence that the Secretary abused his discretion or violated the law by approving the compacts. Thus, the IGRA cannot be fairly interpreted as imposing fiduciary obligations upon the United States. *See Montana Bank,* at 614 (concluding that the Secretary's obligation to review and approve contracts is "not comparable in purpose or degree to the control or supervision of tribal monies or properties that has been found to establish a complete fiduciary relationship with a duty to account as a trustee").

 Lastly, the Tribes claim that they reasonably and in good faith relied upon the validity and certainty of the Secretary's approval of the compacts and as a result have incurred substantial debt in expanding and improving their gaming facilities. Consequently, the Tribes assert that the United States should be equitably estopped from taking any federal criminal enforcement action against them. "[E]quitable estoppel responds to the unfairness inherent in denying the claimant some benefit after it has reasonably relied on the misrepresentations of the adverse party." *United States v. Marine*

*Shale Processors,* 81 F.3d 1329, 1348 (5th Cir.1996). An equitable estoppel claim asserted against the government, however, will succeed only under extraordinary circumstances. *DePaolo v. United States,* 45 F.3d 373, 376 (10th Cir.1995) (quoting *County Comm'rs v. Isaac,* 18 F.3d 1492, 1498 (10th Cir.1994)). " 'Courts generally disfavor the application of the estoppel doctrine against the government and invoke it only when it does not frustrate the purpose of the statutes expressing the will of Congress or unduly undermine the enforcement of the public laws.' " *Id.* (quoting *FDIC v. Hulsey,* 22 F.3d 1472, 1489 (10th Cir.1994)); *Marine Shale Processors,* 81 F.3d at 1348 (5th Cir. 1996). In *Office of Personnel Management v. Richmond,* 496 U.S. 414, 429, 110 S.Ct. 2465, 2474, 110 L.Ed.2d 387 (1990), the Supreme Court expressed concern that "[j]udicial adoption of estoppel based on agency misinformation would ... vest authority in these agents that Congress would be powerless to constrain." "Were the courts to estop the United States readily, the executive branch could use this doctrine strategically to achieve results Congress intended to prevent, thus delivering lawmaking power to the executive in a manner that the [statute] does not contemplate." *Marine Shale Processors,* 81 F.3d at 1348.

 Recently, the Supreme Court cast doubt on whether it would allow an estoppel defense against the government under any set of circumstances. *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387. Even assuming estoppel can be successfully asserted against the government, the claimant must demonstrate that: (1) the government knew the facts; (2) the government intended its conduct to be acted upon or so acted that plaintiffs had the right to believe it was so intended; (3) plaintiffs must have been ignorant of the true facts; and (4) plaintiffs reasonably relied on the government's conduct to their injury. *DePaolo,* at 377; *City of New York v. Shalala,* 34 F.3d 1161, 1168 (2nd Cir.1994) (with respect to fourth factor, reliance must be reasonable). In addition to these four requirements, the Supreme Court has indicated that the claimant must make a

showing of affirmative misconduct on the part of the government. *DePaolo* at 376–377. "Affirmative misconduct means an affirmative act of misrepresentation or concealment of a material fact. Mere negligence, delay, inaction, or failure to follow agency guidelines does not constitute affirmative misconduct." *Id.* at 377 (quoting *Isaac,* 18 F.3d at 1499).

At the hearing, the only facts offered by Tribes to support a finding of affirmative misconduct are the Secretary's initial approval of the compacts and his subsequent position that the casinos must cease their operations because of the New Mexico's Supreme Court's opinions in *State ex rel. Clark v. Johnson* and *Citation Bingo.* These facts by no means support a finding that the Secretary committed an affirmative act of misrepresentation or concealed a material fact. The Tribes have failed to meet their burden to show that the Secretary's actions constituted affirmative misconduct.

■ In addition to offering the above facts to support a showing of affirmative misconduct, the Tribes argue that the affirmative misconduct requirement need not be satisfied when the case arises under circumstances in which the government has a trust relationship with the claimant. The Tribes rely on *Prieto v. United States,* 655 F.Supp. 1187 (D.D.C.1987) and *Pangilinan v. Castro,* 1985 WL 3792 (D.N. Mariana Islands 1985), *aff'd, De Mesa v. Castro,* 844 F.2d 642 (9th Cir.1988), for this proposition. These cases are distinguishable, however. Both *Prieto* and *Pangilinan* rely on the government's fiduciary obligations to the claimant in making the determination that the estoppel claim is meritorious. As discussed earlier, the United States does not owe the Tribes such fiduciary duties because the IGRA does not grant the United States a detailed, comprehensive management role over Indian gaming. Thus, Plaintiffs must establish affirmative misconduct on the part of the Government. Having concluded that the Plaintiffs have not met their burden of establishing that the Secretary's conduct constituted affirmative misconduct, the Court finds it unnecessary to address the other elements of a governmental estoppel claim.

## PUEBLO OF ACOMA'S MOTION TO STRIKE

The Court will not address the Pueblo of Acoma's motion to strike tribal counsel minutes, filed May 21, 1996 as the Court has not taken those exhibits into consideration in reaching its conclusion.

## CONCLUSION

The language and intent of Section 2710(d)(1)(C) of the IGRA established that the appropriate state official(s) must execute gaming compacts on behalf of the State. This requirement is separate and independent from the requirement that the compact be "in effect". Because Governor Johnson did not have the authority to execute gaming compacts on behalf of the State of New Mexico, the Court finds that the compacts are invalid and thus the Tribes have failed to satisfy a requirement necessary for them to conduct Class III gaming. Moreover, the Tribes have failed to make a sufficient showing on essential elements of their remaining claims with respect to which they have the burden of proof.

**IT IS THEREFORE ORDERED** that Defendants' Cross Motion for Summary Judgment, filed May 13, 1996 **[Doc. No. 133]** is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment as to all of Plaintiffs' Claims and as to Defendants' First and Third Counterclaims, filed April 15, 1996 **[Doc. No. 97]**, Plaintiffs' Supplemental Motion for Summary Judgment with Respect to Defendants' Second Counterclaim, filed April 15, 1996 **[Doc. No. 101]** are **DENIED.**